**In re ALMAC'S, INC. and Almac's Supermarkets, Inc., Confirmed Debtors.**

**Arnold ZAHN, as Trustee of the Almac's Creditor Litigation and Distribution Trust, Plaintiff,**

**v.**

**YUCAIPA CAPITAL FUND, Yucaipa Capital Advisors, Inc., Yucaipa Almac's Partners, L.P., Almac's Partners, L.P., the Yucaipa Companies, Yucaipa Companies, Yucaipa Management Company, Ronald W. Burkle, Joe S. Burkle, Mark A. Resnik, Richard d'Abo, Citicorp Securities Markets, Inc., Citicorp North America, Inc., and Citibank, N.A., Defendants.**

Civil Action No. 95–360L.
Misc. No. 95–052L.

United States District Court,
D. Rhode Island.

Nov. 15, 1996.

---

James R. McGowan, Matthew J. McGowan, Salter, McGowan & Swartz, Providence, RI, Timothy J. Hurley, Stephen D. Lerner, Raymond W. Lembke, Timothy C. Sullivan, W. Timothy Miller, Taft, Stettinius & Hollister, Cincinnati, OH, for plaintiff.

Joseph V. Cavanagh, Jr., Michael W. Carroll, Blish & Cavanagh, Providence, RI, James R. Warnot, Jr., Richard A. Lingg, R. Paul Wickes, Shearman & Sterling, New York City, for Citicorp defendants.

Matthew F. Medeiros, Flanders & Medeiros, Providence, RI, Robert J. Rosenberg, James E. Brandt, Latham & Walkins, New York City, for Yucaipa defendants.

## MEMORANDUM AND ORDER

LAGUEUX, Chief Judge.

This case arises from a leveraged buyout that took place prior to the time Almac's Inc. and Almac's Supermarkets, Inc. (collectively "Almac's") filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code. Arnold Zahn, as the trustee of the Almac's Creditor Litigation and Distribution Trust (the "Trustee"), claims that payments made by Almac's to the various Yucaipa[1] and Citicorp[2] Defendants in connection

---

1. The group collectively known as the "Yucaipa Defendants" includes corporate and partnership entities and individual director defendants: Yucaipa Capital Fund, Yucaipa Capital Advisors, Inc., Yucaipa Almac's Partners, L.P., Almac's Partners, L.P., The Yucaipa Companies, Yucaipa Companies, Yucaipa Management Company, Ronald W. Burkle, Joe S. Burkle, Mark A. Resnik and Richard d'Abo. The defendants assert, however, that "Yucaipa Companies" does not exist.

These business entities and individuals are interrelated. For example, Ronald W. Burkle, Mark Resnik, and Richard d'Abo are partners of The Yucaipa Companies; the general partners of The Yucaipa Capital Fund are Yucaipa Capital Advisors, Inc. and The Yucaipa Companies; and Joe S. Burkle is the general partner of Almac's Partners, L.P.

2. The Citicorp Defendants are Citicorp Securities Markets, Inc., Citicorp North America, Inc. and Citibank, N.A.

with the leveraged buyout (the "1991 LBO") constitute fraudulent transfers under Rhode Island law. In addition, the Trustee has sued three individual Yucaipa Defendants, Ronald W. Burkle, Joe S. Burkle, and Mark A. Resnik, who served as directors of Almac's, alleging that they breached their fiduciary duties to Almac's under Delaware General Corporation Law by participating in the 1991 LBO.

This matter is before the Court on the motions of the Yucaipa Defendants and the Citicorp Defendants to withdraw the reference from the Bankruptcy Court pursuant to 28 U.S.C. § 157(d). For the reasons that follow, the motions of both the Yucaipa Defendants and the Citicorp Defendants are granted as to Counts I–IV. This Court concludes, however, that the Bankruptcy Court must dismiss Count V for lack of subject matter jurisdiction. Since the Trustee lacks standing to pursue Count V, he cannot replead it in this Court under 28 U.S.C. § 1332.

## I. Facts

The following facts are undisputed, except as noted. Prior to 1989, Almac's and its affiliate Rhode Island Produce Company (collectively "Old Almac's") were Rhode Island corporations operating grocery stores. On or about July 27, 1989, the Yucaipa Defendants formed a Delaware corporation, Almac's Inc., for the purpose of purchasing substantially all of the operating assets of Old Almac's. In February of 1991, Almac's Inc. was reorganized again as a wholly-owned subsidiary of Almac's Supermarkets, Inc. ("ASI"), another Delaware corporation. The Yucaipa Defendants owned at least 85% of the common stock of ASI.

In 1991, Almac's was the subject of a leveraged buyout—the root of the present litigation. During the 1991 LBO, the majority ownership of Almac's was transferred from the Yucaipa Defendants to a corporation called MAFCO. The partnership of Leonard Green and Partners had created MAFCO, later renamed Almac's Supermarkets Group,

Inc., for the purpose of acquiring the Yucaipa Defendants' stock in Almac's.

In connection with the 1991 LBO, Almac's effected many money transfers in the total amount of $59 million. To finance the transfers and to repay some existing indebtedness, Almac's borrowed approximately $94 million dollars from a bank syndicate (the "Lenders"), to which Almac's granted liens on substantially all of its assets. The most important transfer for purposes of the present controversy was Almac's payment of $44 million to MAFCO.[3] After receiving this dividend, MAFCO paid $63 million to the Yucaipa Defendants in payment for their Almac's stock.

Almac's also paid approximately $4.0 million to the Citicorp Defendants as compensation for their services in the financing of the 1991 LBO. Citibank, N.A. had placed a $44 million syndicated term loan to Almac's and provided other services in connection with that loan. In addition, Citicorp Securities Markets, Inc. served as placement agent for $50 million in senior secured Almac's notes and acted as advisor in the structuring of the transaction. Finally, Citicorp North America, Inc. participated in the term loan and was also lead lender on a revolving credit facility provided to Almac's in the amount of $10 million.

On August 2, 1991, before the purchase of the majority of the Yucaipa Defendants' stock was completed, the director defendants resigned from the board of directors of Almac's. However, as part of the 1991 LBO, Almac's also entered into new consulting agreements with defendants Joe S. Burkle and the Yucaipa Companies. Pursuant to the agreements, Almac's agreed to pay Joe S. Burkle approximately $208,000 per year and The Yucaipa Companies a minimum of $100,000 per year, for a period of years following the 1991 LBO.

Almac's continued to operate, but began experiencing financial difficulties in 1992. In 1993, its operations and sales experienced significant decline, and on August 6, 1993, Almac's Inc. and Almac's Supermarkets, Inc.

---

**3.** Several other transfers are not addressed herein because they are not contested in the present litigation.

filed petitions for reorganization under Chapter 11 of the Bankruptcy Code. During the bankruptcy proceedings, the Citicorp Defendants and Joe S. Burkle filed proofs of claim. On November 8, 1994, the Bankruptcy Court confirmed the Third Amended Consolidated Chapter 11 Plan of Reorganization for Almac's (the "Plan"). The effective date of the Plan was in December of 1994, and it is uncontested that the Plan has been substantially consummated.

Pursuant to the Plan, a company called New Almacs was formed for the purpose of acquiring Almac's assets. New Almacs is a wholly-owned subsidiary of Victory Holdings, Inc., a company that operates supermarkets in central and upstate New York. On the effective date of the Plan, New Almacs acquired all of Almac's operating assets and assumed the operation and management of its business.

Both the Plan and the Disclosure Statement expressly contemplate the pursuit of avoidance claims against the Yucaipa and Citicorp Defendants. Pursuant to the Plan, on the effective date, the Debtors transferred the right to pursue "avoidance claims" against the Yucaipa and Citicorp Defendants to the Trustee.

The Plan defines "avoidance claims" as follows:

all preference, fraudulent transfer, fraudulent conveyance, equitable subordination and other similar claims, whether arising under the Bankruptcy Code or otherwise, of the Debtors, or either Debtor, including, but not limited to, claims recoverable pursuant to Bankruptcy Code sections 502, 510, 541, 544, 545, 547, 548, 550, 551 and 553.

However, the Plan provided that the exclusive right to enforce any causes of action other than avoidance claims vests in New Almac's, Inc. which is owned by the Purchaser, Victory Holdings, Inc.:

Except for the Released Actions and the Avoidance Claims to be assigned to the Creditor Litigation and Distribution Trust pursuant to Section 8.3 hereof, on and as of the Effective Date, all rights and interests of the Consolidated Estates in respect of

any and all claims, demands, actions and causes of action, including but not limited to claims under Sections 510(c), 544, 547, 548, and 550 of the Bankruptcy Code, shall be assigned to New Almacs pursuant to the New Almacs Purchase Agreement, without any representations or warranties.

The Plan expressly provided for the distribution of the proceeds of avoidance claims. The Disclosure Statement in Support of the Second Amended Consolidated Plan of Reorganization for Almac's summarized the complex distribution scheme as follows:

[T]he proceeds will be distributed first to reimburse New Almacs for $500,000 to be advanced by New Almacs to the Creditors Litigation and Distribution Trustee on the Effective Date and to pay the costs of the litigation in excess of the funded costs, to a maximum of $500,000; next to a bonus fee provided to professionals hired to pursue the litigation and to the payment of the unpaid portion of the $3.0 million New Almacs Junior Subordinated Obligation; next to the repayment to New Almacs of its payments on the New Almacs Junior Subordinated Obligation; next to remaining litigation costs; and last to be split 75% to the Class 3A Claimants [the unsecured creditors] and 25% to New Almacs.

In essence, from any recovery under the avoidance claims, the Trustee would have to pay approximately $3.0 million to the Purchaser as well as legal fees and expenses, before the unsecured creditors begin to receive their 75% share of the proceeds. Memorandum of Law in Support of Citicorp Defendants' Motion to Dismiss Complaint at 14.

The Plan also expressly delineated the scope of the Bankruptcy Court's retained jurisdiction. Article XI of the Plan provides in pertinent part:

Notwithstanding Confirmation or the Effective Date having occurred, the Bankruptcy Court shall retain full jurisdiction as provided in 28 U.S.C. section 1334 to enforce the provisions, purposes, and intent of this Plan including, without limitation ... [a]djudication of any causes of action brought or continued by the Debtors, New Almacs as assignee of the Debtors, the Disbursing Agent, and the Credi-

tor Litigation and Distribution Trustee with respect to the Avoidance Claims assigned to it.

On May 9, 1995, the Trustee filed his complaint against the Yucaipa and Citicorp Defendants in Bankruptcy Court. Counts I, II, III, and IV seek to avoid payments made by Almac's to effect MAFCO's purchase of Almac's stock (Counts I and II) and payments made by Almac's to the Citicorp Defendants as payment for their services in structuring the financing of the 1991 LBO (Counts III and IV). The Trustee alleges that the payments constitute fraudulent transfers as defined by Rhode Island General Laws §§ 6–16–4(a)(2)(A), 6–16–4(a)(2)(B), and 6–16–5(a) and should be avoided pursuant to §§ 544(b) and 550(a) of the Bankruptcy Code and Rhode Island General Laws §§ 6–16–7 and 6–16–8(b).

In addition, in Count V of the complaint, the Trustee brings a breach of fiduciary duty action under Delaware General Corporation Law against the three individual Yucaipa Defendants who served as directors of Almac's during the 1991 LBO. It is the Trustee's principal contention that the 1991 LBO drove Almac's into bankruptcy. Therefore, the Trustee claims that the individual Yucaipa Defendants who served as directors of Almac's should be held jointly and severally liable for the approximately $59 million that Almac's paid to accomplish the 1991 LBO.

On July 7 and July 10, 1995, the Yucaipa Defendants and the Citicorp Defendants filed separate motions in this Court seeking permissive withdrawal of the reference from the Bankruptcy Court. The two motions were originally assigned to two different judges (this writer and Senior Judge Boyle), but they are now both before this Court. Simultaneously, the Citicorp and Yucaipa Defendants filed motions to dismiss and to stay discovery in the Bankruptcy Court. The Yucaipa Defendants also filed a motion to transfer venue in the Bankruptcy Court.

The Yucaipa Defendants argue that there is no subject matter jurisdiction in the Bankruptcy Court because the Plan has been confirmed and substantially consummated. They emphasize that the Plan did not retain jurisdiction over Count V—which they interpret to be outside the Plan's definition of "avoidance claims"—and argue that the resolution of this dispute will have no effect on the restructuring of debtor-creditor relations. Moreover, the Yucaipa Defendants argue that the five counts of the complaint constitute non-core claims which this Court would be obliged to review *de novo* on appeal. Since the entire proceeding should be allowed to progress in a court of undisputed jurisdiction, subject to normal appellate review, the Yucaipa Defendants argue that the reference should be withdrawn.

The Citicorp Defendants agree with the arguments posed by the Yucaipa Defendants. Additionally, the Citicorp Defendants contend that they are entitled to a jury trial. They argue that conducting a jury trial in the Bankruptcy Court would violate the reexamination clause of the 7th Amendment because this Court would be obliged to conduct *de novo* review of the jury's findings.

In contrast, the Trustee argues that there is proper subject matter jurisdiction in the Bankruptcy Court because the Plan explicitly retains jurisdiction over all avoidance claims and the proceeds of the claims are for the substantial benefit of the unsecured creditors. Central to the Trustee's contention is his view that the Plan's definition of avoidance claims encompasses the Count V breach of fiduciary duty claim. Moreover, the Trustee asserts that the Defendants were aware of the provisions of the Plan concerning jurisdiction, and therefore, they are barred by the doctrine of *res judicata* from contesting the subject matter jurisdiction of the Bankruptcy Court at this juncture. In addition, the Trustee argues that he asserts purely core claims which will be subject to normal appellate review in this Court and that notions of judicial economy demand that this proceeding be resolved by the Bankruptcy Court, a court which is already familiar with the case.

## II. Standard for Decision

Pursuant to 28 U.S.C. § 1334(b) (1994), jurisdiction over bankruptcy proceedings vests in the first instance with the district court. Under 28 U.S.C. § 157(a) (1994),

bankruptcy proceedings may be automatically referred, as this district has done by way of a standing order, to the Bankruptcy Court. *See* Order Referring Bankruptcy Proceedings, dated July 18, 1984. However, a district court has discretion to withdraw a proceeding from the Bankruptcy Court pursuant to 28 U.S.C. § 157(d) (1994): "[t]he district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." [4]

Although the statute does not define "cause" more specifically, *see In re Sevko, Inc.,* 143 B.R. 114, 116 (Bankr.N.D.Ill.1992), courts have cautioned that it "is not an empty requirement." *In re Parklane/Atlanta Joint Venture,* 927 F.2d 532, 536 (11th Cir. 1991). Rather, "[t]he express language and legislative history of § 157(d) make clear that Congress intended to have bankruptcy proceedings adjudicated in the bankruptcy court unless withdrawal was essential to preserve a higher interest." *United States v. Kaplan,* 146 B.R. 500, 502 (Bankr.D.Mass.1992).

■ The moving party bears the burden of demonstrating that both the timeliness and cause requirements of § 157(d) have been met. *See, e.g., Id.* at 503.

### III. Analysis

### A. Subject Matter Jurisdiction

As a preliminary matter, this Court must decide whether the Bankruptcy Court has subject matter jurisdiction over this proceeding. Simply put, before this Court can decide whether or not the Bankruptcy Court should decide this matter, it must be decided whether that Court is empowered to decide the case at all.

The scope of bankruptcy jurisdiction is governed by 28 U.S.C. § 1334(b) (1994), which provides in pertinent part:

Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceeding

arising under title 11, or arising in or related to cases under title 11.

■ It is sufficient for jurisdictional purposes if a proceeding meets the threshold for related proceedings. *See In re Boone,* 52 F.3d 958, 960 (11th Cir.1995); *In re Marcus Hook Development Park, Inc.,* 943 F.2d 261, 264 (3rd Cir.1991).

Courts have interpreted the jurisdictional grant articulated in § 1334(b) very broadly. *See, e.g., Celotex Corp. v. Edwards,* —— U.S. ——, —— – ——, 115 S.Ct. 1493, 1498–1499, 131 L.Ed.2d 403 (1995) ("Congress did not delineate the scope of 'related to' jurisdiction, but its choice of words suggests a grant of some breadth"); *In re TGX Corporation,* 168 B.R. 122, 129 (Bankr.W.D.La.1994) (same). Prior to confirmation of a plan of reorganization, therefore, "nearly any suit by or against the debtor may be entertained in federal court: the outcome of nearly any such suit will have an effect upon the debtor's estate." *Id.* (citing 1 Collier on Bankruptcy ¶ 3.01[1][c][ii] (Lawrence P. King et al. eds., 15th ed. 1994)).

The "usual articulation" of the test governing "related to" jurisdiction is "whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re G.S.F. Corp.,* 938 F.2d 1467, 1475 (1st Cir.1991) (quoting *Pacor v. Higgins,* 743 F.2d 984, 994 (3rd Cir.1984) (citations omitted)). *See also Celotex Corp. v. Edwards,* —— U.S. at ——, n. 6, 115 S.Ct. at 1499, n. 6 (citing *Pacor* with approval and noting that "[t]he First, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits have adopted the *Pacor* test with little or no variation").

However, the present controversy concerns postconfirmation jurisdiction, an area of considerable disagreement. Struggling with the competing concerns of resolving bankruptcy matters in Bankruptcy Court and avoiding the entrapment of corporations in "tutelage" to the Bankruptcy Court, *In re Cinderella Clothing Industries, Inc.,* 93 B.R. 373, 376 (Bankr.E.D.Pa.1988) (quoting *North*

---

**4.** 28 U.S.C. § 157(d) also governs mandatory withdrawal of the reference. However, that issue has not been raised in the present case.

*American Car Corp. v. Peerless Weighing & Vending Mach. Corp.,* 143 F.2d 938, 940 (2nd Cir.1944)), courts have reached markedly different conclusions concerning the scope of postconfirmation jurisdiction. Some courts have held that jurisdiction is inherently limited after confirmation, *see, e.g. Walnut Associates v. Saidel,* 164 B.R. 487, 491 (Bankr. E.D.Pa.1994), while others have concluded that "the broad statutory parameters of federal bankruptcy jurisdiction are unaffected by confirmation." *See, e.g., In re TGX Corp.* 168 B.R. at 130; *Refrigerant Reclamation Corp. of America,* 186 B.R. 78, 82 (Bankr. M.D.Tenn.1995) (same). *See also* 5 Collier on Bankruptcy ¶ 1142.01 (Lawrence P. King et al. eds., 15th ed. 1996) ("So long as a chapter 11 case is 'open,' there does not appear to be any limit on the court's jurisdiction under 28 U.S.C. 1334(b) with respect to civil proceedings arising under title 11 or arising in or related to cases under title 11").

■ This Court adopts the view that confirmation does not automatically constrict the scope of jurisdiction permissibly exercised by bankruptcy courts. Section 1334(b) does not evince an intent to curtail bankruptcy jurisdiction upon confirmation or substantial consummation, and this Court will not read one into the statute. In contrast, chapter 11 contains a provision which expressly provides for continuing bankruptcy jurisdiction after confirmation: 11 U.S.C. § 1142(b) authorizes postconfirmation bankruptcy orders "necessary for the consummation of the plan." [5]

■ Although this Plan has been substantially consummated, it has not been fully consummated. The Defendants conflate these two distinct phases of a plan's progression, but substantial consummation is merely one step along the path toward consummation. *See In re Terracor,* 86 B.R. 671, 676 n. 12 (Bankr.D.Utah 1988). As the Court stated in *In re Polar Molecular Corp.,* 195 B.R. 548, 555 (Bankr.D.Mass.1996),

[a]lthough upon the substantial consummation of a plan the court's jurisdiction is reduced, the court is not without jurisdiction to enforce the remaining unperformed terms of the confirmed plan. A contrary holding would render the provisions of § 1142 of the Code meaningless.

■ In light of the view that jurisdictional analysis in the postconfirmation context proceeds unchanged under 28 U.S.C. § 1334(b), this Court's determination turns upon whether the resolution of the present case will "conceivably have an effect on the estate." For the purposes of this inquiry, the Court will consider Counts I–IV separately from Count V, addressing Counts I–IV first.

The Yucaipa and Citicorp Defendants contend that Counts I–IV assert "plain vanilla, state law claims." They emphasize that the Trustee sued under 11 U.S.C. § 544(b) (1994), which permits avoidance of fraudulent transfers under state law, rather than 11 U.S.C. § 548 (1994) which provides a remedy directly under the Bankruptcy Code.[6] In addition, the Defendants propose a restricted view of postconfirmation jurisdiction and argue that resolution of this dispute will not affect the estate. In so arguing, the Defendants distinguish between augmenting the size of the estate, the sole potential effect of the present litigation, and changing the allocation of funds. Since the Plan already sets forth the distribution of any recovery, the Defendants argue that the estate will not be affected. Finally, the Defendants assert that, under the distribution scheme, any recovery will be for the substantial benefit of the Purchaser, "a stranger to the estate." In contrast, the Trustee stresses that the Plan specifically contemplates the pursuit of avoidance actions against the Defendants and explicitly provides for the retention of jurisdiction over avoidance claims. The Trustee also emphasizes that there is a possibility of a sizable recovery which will substantially in-

**5.** 11 U.S.C. § 1142(b) (1994), Implementation of plan, provides:

> The court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien,

that is necessary for the consummation of the plan.

**6.** Since 11 U.S.C. § 548 only applies to transfers occurring in the year before a petition for reorganization is filed under Chapter 11, the Trustee was forced to sue under § 544(b).

ure to the benefit of the unsecured creditors, parties who are specifically designated as beneficiaries in the Plan.

This Court concludes that there is subject matter jurisdiction over Counts I–IV. Although mindful of oft-cited concerns about entrapping parties in bankruptcy court, this Court opines that the exercise of bankruptcy jurisdiction over Counts I–IV will not upset this delicate balance.

■ Increasing the amount of money recovered by the unsecured creditors in a way anticipated by the Plan does affect the estate. *Cf. In re Xonics, Inc.*, 813 F.2d 127, 131 (7th Cir.1987) (finding a dispute to be "related to" a bankruptcy when "it affects the amount of property available for distribution . . ."). The rights of the unsecured creditors to recover proceeds from these avoidance claims arise directly from the Plan. Indeed, many cases have considered the retention of jurisdiction over avoidance claims as appropriate. *See In re Churchfield Management & Inv. Corp.*, 122 B.R. 76, 80 (Bankr.N.D.Ill.1990) (finding subject matter jurisdiction over avoidance claims and noting that "courts have consistently upheld postconfirmation jurisdiction to recover preferential payments where the plan of reorganization provided for retention of jurisdiction"). *Cf. In re Polar Molecular Corporation*, 195 B.R. 548 (finding subject matter jurisdiction in Bankruptcy Court over claim to recover estate funds for unsecured creditors in a postconfirmation and substantial consummation context).

■ Moreover, Counts I–IV will potentially yield a significant benefit to the unsecured creditors even though the Purchaser stands to gain as well. Counts I–IV assert avoidance actions totalling $48 million. If the Trustee prevails, the unsecured creditors would receive approximately $33 million less attorney's fees. It is clear that the entire recovery need not be for the unsecured creditors. *See In re Kroh Bros. Dev. Co.*, 100 B.R. 487, 498 (Bankr.W.D.Mo.1989), *appeal denied*, 101 B.R. 1000 (Bankr.W.D.Mo.1989) ("The Court is firmly convinced that the 50-50 split between the unsecured creditors and the Ozar Partnership has more than an indirect benefit to the unsecured creditors").

■ However, the same concerns that weigh toward finding jurisdiction in the Bankruptcy Court over Counts I–IV are fatal to the Bankruptcy Court's assertion of jurisdiction over Count V.

This Court is not persuaded by the Trustee's argument that the Plan provision defining "avoidance claims" embraces Count V. The Trustee contends that breach of fiduciary duty claims and avoidance actions are "similar" claims because they are "frequently joined." Under this strained definition of "similarity," any two claims that are often brought together could be considered similar without regard to substance. However, breach of fiduciary duty claims are fundamentally different from avoidance actions and the two have fundamentally different goals. Breach of fiduciary duty claims seek damages for wrongful conduct committed against the corporation. In contrast, avoidance actions sound in equity and are typically brought by creditors who seek to undo a financial transfer, without regard to the innocence of the recipient.

Since the Plan did not purport to retain jurisdiction over Count V type claims, recovery under that portion of the complaint would merely benefit the Purchaser, a stranger to the estate. Moreover, although parties may not create jurisdiction by provision in a confirmed plan where it does not otherwise exist, *see, e.g., In re Cary Metal Products*, 158 B.R. 459, 462 (Bankr.N.D.Ill. 1993), *aff'd, Zerand–Bernal Group, Inc. v. Cox*, 23 F.3d 159 (7th Cir.1994), many courts find the retention of jurisdiction to be a prerequisite to the adjudication of a postconfirmation claim in bankruptcy court. *See, e.g. In re Johns–Manville Corp.*, 7 F.3d 32, 34 (2d Cir.1993) ("The bankruptcy court's post confirmation jurisdiction . . . is defined by reference to the Plan"). Since Count V will only benefit the Purchaser and jurisdiction over such a claim has not been retained in the Plan, this Court concludes that the Bankruptcy Court lacks subject matter jurisdiction over Count V.

As a final note concerning subject matter jurisdiction, this Court's analysis was undeterred by the Trustee's assertion of the doc-

trine of *res judicata*. The Trustee argues that the Defendants are barred from contesting subject matter jurisdiction in the Bankruptcy Court at this time because they were aware that the Plan provided for the exercise of such jurisdiction. Although the Court notes that the Trustee's analysis would render the Bankruptcy Court the final arbiter of its own jurisdiction, the issue is only relevant with respect to Count V, because this Court finds subject matter jurisdiction over Counts I–IV. Since the Plan does not anticipate the retention of jurisdiction over breach of fiduciary duty claims, the Trustee's arguments are of no moment.

## B. The Trustee's Standing to Assert Count V

■ Under the Plan, the Trustee lacks standing to assert Count V. The Plan gives the Trustee the power to bring only avoidance claims, and, for reasons stated above, this Court finds that Count V is not an avoidance claim. The Plan authorizes only New Almac's, Inc. to pursue a breach of fiduciary duty action. Therefore, the Trustee may not replead Count V in this Court asserting 28 U.S.C. § 1332 (diversity of citizenship) as the basis for jurisdiction.

## C. Permissive Withdrawal of the Reference

■ This Court determines that the Yucaipa and Citicorp Defendants have satisfied both the timeliness and cause requirements mandated by § 157(d). According to caselaw, "[t]imeliness is assessed from the time a complaint is filed or from the time the grounds for withdrawing the complaint first become apparent." *United States v. Kaplan*, 146 B.R. at 503 (citations omitted). The Yucaipa and Citicorp Defendants moved to withdraw the reference from the Bankruptcy Court on July 7 and July 10, 1995 respectively, merely two months after the Trustee filed the complaint. During those two months, there was no significant development in the case rendering withdrawal of the reference inconvenient or inappropriate. Therefore, this Court finds that the motions of the Yucaipa and Citicorp Defendants to withdraw

the reference pursuant to § 157(d) were timely made.

■ When deciding what constitutes sufficient "cause" to justify permissive withdrawal of the reference, many courts focus on the analysis articulated in *Holland America Ins. Co. v. Succession of Roy*, 777 F.2d 992 (5th Cir.1985). That Court stated that when deciding whether to withdraw the reference, a "district court should consider the goals of promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering the economical use of the debtors' and creditors' resources, and expediting the bankruptcy process." *Id.* at 999. The requisite cause may be found "[i]f one or more of these factors is present." *United States v. Kaplan*, 146 B.R. at 504.

■ The classification of the claims at issue as core or non-core is a pivotal part of this inquiry. The Eighth Circuit has defined core and non-core proceedings as follows:

> Core proceedings under 28 U.S.C. § 157 are those which arise only in bankruptcy or involve a right created by federal bankruptcy law. Non-core related proceedings are those which do not invoke a substantive right created by federal bankruptcy law and could exist outside of a bankruptcy, although they may be related to a bankruptcy. (citations omitted).

*Specialty Mills, Inc. v. Citizens State Bank*, 51 F.3d 770, 773–774 (8th Cir.1995).

■ The distinction is significant for purposes of withdrawing a reference, because "it is upon this issue that questions of efficiency and uniformity will turn." *In re Orion Pictures Corp.*, 4 F.3d 1095, 1101 (2d Cir.1993), *cert. dismissed*, —— U.S. ——, 114 S.Ct. 1418, 128 L.Ed.2d 88 (1994). Whether the fraudulent transfer claims are core or non-core as defined by § 157(b) (1994) does not affect the power of this Court to withdraw the reference, *see In re Sevko, Inc.*, 143 B.R. at 115, although a district court must conduct *de novo* review of bankruptcy court decisions concerning non-core matters, *see* 28 U.S.C. § 157(c)(1) (1994) while core matters are typically subject to normal appellate review. *See* 28 U.S.C. 157(b)(1) (1994).

■ In 28 U.S.C. 157(b)(2)(H) (1994), fraudulent conveyance actions are explicitly designated as an example of "core proceedings." Despite this statutory designation, there is authority holding that, as a constitutional matter, such claims must be finally decided by an Article III tribunal. Although § 1334(b) defines bankruptcy jurisdiction broadly, history demonstrates the Supreme Court's concern with containing the power of a bankruptcy court—a non-Article III tribunal. In *Northern Pipeline Constr. Co. v. Marathon Pipe Line Company*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), a plurality of the Supreme Court concluded that 28 U.S.C. § 1471, enacted in 1978, was impermissibly broad in granting jurisdiction to bankruptcy judges. In *Thomas v. Union Carbide Agricultural Products, Co.*, 473 U.S. 568, 584, 105 S.Ct. 3325, 3334–35, 87 L.Ed.2d 409 (1985), the Court defined the holding of *Marathon* as follows:

> The Court's holding in that case establishes only that Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review.

*See also, Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 839, 106 S.Ct. 3245, 3250, 92 L.Ed.2d 675 (1986) (upholding this view). Despite the current narrow conception of the holding of *Marathon*, the decision still signals the need to reconcile bankruptcy jurisdiction with the mandates of Article III. *See In re Orion Pictures Corp.*, 4 F.3d at 1102 (noting that the term "core" was meant to embrace a "wide range of matters," but finding "no evidence of any Congressional intent to contravene the Supreme Court's holding in *Marathon* ").

Furthermore, in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), the Court again addressed the scope of a bankruptcy court's power. The Court first noted that both the question of whether the Seventh Amendment requires a jury trial in a particular action and the question of whether Article III allows a non-Article III tribunal to adjudicate a claim will yield the same answer. *Id.* at 53, 109 S.Ct. at 2796. *See also In re Clay*, 35 F.3d 190, 194 (5th Cir.1994) (same). The Court stated that a party asserting a private, as opposed to a public, right may demand a jury trial. *Id.* at 53, 109 S.Ct. at 2796. In dicta, the Court then concluded that "a bankruptcy trustee's right to recover a fraudulent conveyance under 11 U.S.C. § 548(a)(2) seems to us more accurately characterized as a private rather than a public right . . ." when no proof of claim has been filed. *Id.* at 55, 58, 109 S.Ct. at 2797, 2799. If fraudulent transfer claims assert private rights that require a jury trial, then, under the reasoning in *Granfinanciera*, the power to render a final decision over such proceedings must lie with an Article III court. Indeed, the Supreme Court recognized that:

> if a statutory cause of action, such as respondent's right to recover a fraudulent conveyance under 11 U.S.C. § 548(a)(2), is not a 'public right' for Article III purposes, then Congress may not assign its adjudication to a specialized non-Article III court lacking 'the essential attributes of the judicial power.'

*Id.* at 53, 109 S.Ct. at 2796 (quoting *Crowell v. Benson*, 285 U.S. 22, 51, 52 S.Ct. 285, 292, 76 L.Ed. 598 (1932)).

■ The 5th Circuit, relying on *Granfinanciera*, recently cast further doubt on the power of bankruptcy courts to render final decisions in fraudulent conveyance cases. *See In re Texas General Petroleum Corp.*, 52 F.3d 1330 (5th Cir.1995). That Court emphasized that a core/non-core analysis alone does not define the scope of a bankruptcy court's power. Rather, an Article III court must conduct a separate constitutional inquiry in order to determine whether or not full judicial power by the bankruptcy court comports with the demands of Article III. *In re Texas General Petroleum Corp.*, 52 F.3d at 1336. The Court stated:

> Congress has designated fraudulent conveyance actions as core proceedings. Thus, because bankruptcy courts have the power to adjudicate core proceedings and because fraudulent conveyance actions are labeled as such, a bankruptcy court might assume that it has plenary authority to

decide fraudulent conveyance actions. As it turns out, that court would be mistaken. *Id.* at 1336. *See also In re Davis,* 899 F.2d 1136, 1140 n. 9 (11th Cir.), *cert. denied, Gower v. Farmers Home Admin.,* 498 U.S. 981, 111 S.Ct. 510, 112 L.Ed.2d 522 (1990) (stating, in dicta, that the "assumption" that adjudicating all "core" proceedings in non-Article III tribunals is constitutional is "open to serious question" after *Granfinanciera* ). *Cf. In re Arnold Print Works, Inc.,* 815 F.2d 165, 169 (1st Cir.1987) ("We now consider whether the determination that Arnold's action is a core proceeding creates an unconstitutional interpretation of § 157(b)").

The reasoning in both *Granfinanciera* and *Texas Petroleum* is consonant with the need to define the constitutional limitations restraining bankruptcy jurisdiction within the broad parameters established in § 1334(b). Although this Court is mindful of the many cases holding that fraudulent transfer claims are core proceedings subject only to normal appellate review, *see, e.g., In re Wedtech,* 81 Bankr. 237 (Bankr.S.D.N.Y.1987); it is also mindful of the Supreme Court's words of caution in *Thomas v. Union Carbide:* "practical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III." *Id.* at 587. This is especially true in the present controversy, as the claims arise not under § 548 of the Bankruptcy Code, but under § 544 which deals with state law.

Therefore, this Court concludes that the power to enter a final decision over Counts I and II must rest with an Article III tribunal. The reference should be withdrawn with respect to Counts I and II to avoid the waste of judicial resources that would result if this Court were forced to conduct *de novo* review of the Bankruptcy Court's findings. *Cf. In re Orion Pictures Corp.,* 4 F.3d at 1101 (finding that "the fact that a bankruptcy court's determination on non-core matters is subject to *de novo* review by the district court could lead the latter to conclude that in a given case unnecessary costs could be avoided by a single proceeding in the district court").

Courts have emphasized *Granfinanciera's* distinction between cases where a proof of claim has been filed and those where no proof of claim has been filed. *See In re Investment Bankers, Inc.,* 4 F.3d 1556, 1561 (10th Cir.1993), *cert. denied, Davis, Gillenwater & Lynch v. Turner,* 510 U.S. 1114, 114 S.Ct. 1061, 127 L.Ed.2d 381 (1994). However, that presents no obstacle to withdrawing the reference in the present case. Joe Burkle was the only Yucaipa Defendant to submit a proof of claim in the bankruptcy proceeding and he did so only with respect to the consulting agreement made after the 1991 LBO. Counts I and II of the complaint name thirteen other entities and individuals, and, even though Joe Burkle is involved with other Yucaipa entities, judicial economy clearly favors trying Counts I and II in this Court.

Since Counts I and II should be withdrawn from the Bankruptcy Court, Counts III and IV should also be adjudicated by this Court even though the Citicorp Defendants filed proofs of claim in the bankruptcy proceeding. All counts of the complaint stem from the same core of facts. Substantively, this case revolves around the Defendants' respective roles in the financing and consummation of the 1991 LBO and whether or not the LBO pushed Almac's inevitably toward insolvency. There is a substantial overlap in the issues involved in the fraudulent transfer claims asserted against the Yucaipa Defendants and those asserted against the Citicorp Defendants, the most significant being the financial status of Almac's at the time of the transfers. Therefore, it would waste the resources of both the parties and the judiciary to split this proceeding and litigate these issues in two separate forums.

It is well-recognized that preventing such a waste of judicial resources may trigger use of § 157(d). For example, in *Congress Credit Corp. v. AJC Int'l, Inc.,* 42 F.3d 686 (1st Cir.1994), the Court directed the district court to apply § 157(d) to preference actions pending in bankruptcy court to enable those proceedings to be consolidated with a diversity lien action in the district court. The First Circuit stated therein:

> We direct use of § 157(d) not because of any fault on the part of the bankruptcy court, but because bringing the preference

claims into the district court will allow all facets of these controversies affecting the same property and the same defendants to be disposed of by one tribunal having undoubted jurisdiction and authority.

*Id.* at 691. *See also In re Sevko, Inc.,* 143 B.R. 114 (applying § 157(d) when two proceedings involving the same core of facts, but different parties, were being handled in both bankruptcy and non-bankruptcy forums); *In re Wedtech Corp.,* 81 B.R. at 239 (holding that "the overlapping of facts, transactions, and issues in the two cases ... is good cause for withdrawal of the reference and consolidation with the district court proceeding").

Finally, the Court declines to address the import of the Citicorp Defendants' view that they are entitled to a jury trial. The Court's path of analysis rendered this inquiry unnecessary for present purposes. If the Citicorp Defendants demand a jury trial here, the Court will address the validity of that demand at the appropriate time.

## IV. Conclusion

For the foregoing reasons, the motions of both the Yucaipa Defendants and the Citicorp Defendants to withdraw the reference are granted as to Counts I–IV. The Bankruptcy Court is ordered to dismiss Count V for lack of subject matter jurisdiction. Since the Trustee lacks the standing and authority to bring Count V, he may not replead it in this Court under 28 U.S.C. § 1332.

It is so ordered.