1800POSTCARDS, INC., Plaintiff,

v.

James MOREL a/k/a James Morelewicz, Defendant,

and

The Official Committee of Unsecured Creditors of Popsmear, Inc., Defendant–Intervenor.

No. 01 Civ. 3364(LAK).

United States District Court, S.D. New York.

June 18, 2001.

Stephen M. Harnik, Law Offices of Stephen M. Harnik, New York City, for Plaintiff.

Brendan W. Nolan, Lambert & Weiss, New York City, for Defendant.

Ira M. Levee, Maureen McLeer Morin, Lowenstein Sandler PC, Roseland, NJ, for Defendant Intervenor.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiff here seeks a preliminary injunction restraining defendant from interfering with its Internet web site and directing defendant to deposit his shares in plaintiff with the Clerk to be held as security for the collectability of any judgment plaintiff may obtain against him as well as an order withdrawing the reference to the Bankruptcy Court of a related adversary proceeding pending against plaintiff by a bankrupt corporation wholly owned by the defendant.

*Facts*

*The Acquisition*

Defendant James Morel owns all of the common stock of a corporation called Popsmear, Inc. ("PSI"),[1] which operated an advertising postcard business under the trade name and style "1800Postcards."[2]

On June 2, 2000, Morel and PSI entered into an agreement of sale with plaintiffs David Moyal and 1800Postcards, Inc. ("1–800") pursuant to which PSI agreed to sell, and 1–800 agreed to buy, "the assets of the business known as 1–800–POSTCARDS ... including without limitation ... all copyrights [and] trademarks ..."[3] Several provisions of the agreement are pertinent to the current dispute:

- The purchase price was to be $110,000, a minimum of $100,000 of which was to be paid to PSI in cash.[4]
- Morel and PSI represented and warranted, *inter alia*, that PSI was the

---

1. Morel Decl. ¶ 2.

2. *See id.* ¶ 5.

3. Moyal Aff. Ex. A, ¶ 1.

4. *Id.* ¶ 2.

owner of and had good and marketable title to the Assets, free of all liens, claims or encumbrances.[5]

- Morel and PSI represented and warranted also that PSI had no liabilities of any kind, contingent or otherwise, not listed in an exhibit entitled Comprehensive Debt Statement.[6]

- 1–800 expressly disclaimed assumption of any liabilities of PSI. Nevertheless, it covenanted "to discharge, to the extent possible, all obligations personally guaranteed by James Morel from future proceeds and profits of the business" and agreed "to pay all of James Morel's personal credit cards as disclosed in [an exhibit] within six (6) months of Closing . . ." [7]

- The agreement provided that "Morel shall retain a fifty (50%) percent equity interest in the new entity [1–800]" and that a shareholders' agreement would be prepared and executed whereby "full management and control of the business [would] be delegated to David Moyal, who will have full control, without any interference by James Morel, of all aspects of the business, including hiring, firing, leasing purchasing [sic], managing, production, marketing [sic]." [8]

- Morel and Moyal both were to be employed by 1–800 at annual salaries of $60,000 and expenses of $20,000 for the first year with annual salaries in subsequent years of $100,000 or as Morel and Moyal otherwise might agree. Net profits, after payment of existing debt, were to be divided in the ratio of 60–40 between Morel and Moyal for the first two years and divided equally between them thereafter. Morel was to "be employed strictly as a marketing consultant" so long as he remained a shareholder, but "Moyal shall have full authority with respect to all matters." [9]

## The Shareholders' Agreement

At or about the same time, Morel and Moyal, the only shareholders of 1–800, entered into the anticipated shareholders' agreement. In relevant part, it provided for the election of Moyal and Morel as the only directors of the company, Moyal as president, and Morel as secretary.[10] It further stated that Moyal "will irrevocably and totally have full control over all aspects of the 'CORPORATION' as set forth in the contract of sale" and that Morel "shall have no control whatsoever, and shall be employed as . . . a Marketing Consultant to the Corporation, whose input shall be advisory only." [11]

## The Initial Falling Out

Shortly after the closing, the relationship between the parties quickly deteriorated. Moyal claims that he discovered that assets that he thought 1–800 had purchased had been sold and removed from the premises before the closing and, moreover, that some of those assets had been leased rather than owned outright, as Morel previously had understood to be the

---

5. *Id.* ¶ 9(c).

6. *Id.* ¶ 9(g).

7. *Id.* ¶ 25. The relevant exhibit that was attached to the agreement was a lease and did not list any credit card debts. Unfortunately, this error is typical of the drafting of the agreement.

8. *Id.* ¶ 27.

9. *Id.* ¶ 28.

10. Morel Decl. Ex. B, arts. tenth, eleventh.

11. *Id.* art. twelfth.

case.[12] The lease that PSI had agreed to assign as part of the transaction proved not to be assignable.[13] PSI, allegedly contrary to its representation, was a defendant in a substantial lawsuit to which 1–800 was joined as a defendant following the closing.[14] There were other grievances. For present purposes, however, it is necessary to understand only that 1–800 suspended Morel's employment and demanded rescission in July 2000.[15]

## The PSI Bankruptcy and the Adversary Proceeding

On September 11, 2000, PSI filed a petition for reorganization under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York.[16] This was followed on March 15, 2001 by PSI's commencement, as debtor-in-possession, of an adversary proceeding against Moyal and 1–800.

PSI claims in the adversary proceeding that it duly transferred the business to 1–800 and that 1–800 paid $100,000 of the purchase price, but that it has failed to pay the remaining $10,000 or PSI's debts, as allegedly required by the purchase agreement, and terminated Morel. It seeks damages in the amount of the allegedly unpaid liabilities, an accounting for profits earned since the closing, rescission of the transaction, and specific performance.[17]

## The Web Site

Recently, 1–800 learned that on June 1, 2000—the day before the closing—PSI assigned its "1800Postcards.com" trademark to Morel personally.[18] "Thus," as Moyal puts it, "when Morel purported to sell seller's trademark rights, he was, in fact, selling nothing."[19] Further, although it is undisputed that PSI was obliged to deliver its 1800Postcards.com web site as part of the transaction,[20] Morel recently used his access to the web site to change the password.[21] According to Moyal, this has shut down 1–800's ability to make administrative changes to the web site and to access and change its e-mail mail boxes.[22] Moreover, the firm that hosts the web site reportedly would not allow 1–800 to create or change the password because Morel—

---

12.  Moyal Aff. ¶ 4(ii)-(iii).

13.  *Id.* ¶ 4(iii).
It should be noted that the lease was attached to the purchase agreement and expressly provided that it was not assignable absent the consent of the landlord. Moyal Aff. Ex. A, lease ¶ 11. In these circumstances, any reliance by 1–800 on any contrary representation probably would have been unjustified as a matter of law, even putting aside the fact that the purchase agreement contains a merger clause and disclaimer of representations other than those contained therein.

14.  Moyal Aff. ¶ 4(vi).
Paragraph 9(e) of the purchase agreement represented that there were no suits pending against PSI except as disclosed in Exhibit C thereto. Moyal claims that Exhibit C to the agreement was PSI's payroll, which has nothing to do with the representation. *Id.* If Moyal is correct that Exhibit C is the PSI payroll, then it obviously does not disclose the lawsuit in question. Certainly Morel does not suggest

otherwise. The irrelevance of the exhibit to the representation, however, raises the question whether this reflects another error in the preparation of the agreement.

15.  Morel Aff. ¶ 20; Moyal Aff. ¶ 5.

16.  Moyal Aff. ¶ 6.

17.  *Id.* Ex. B.

18.  *Id.* ¶ 4(iv). Morel admits that the mark was assigned to him by his counsel. He has agreed that he will convey it if it "was improperly assigned ... pursuant to an order of the Bankruptcy Court." Morel Decl. ¶ 35.

19.  Moyal Aff. ¶ 4(iv).

20.  *Id.* ¶ 13; *see* Morel Decl. ¶ 47.

21.  Moyal Aff. ¶ 13; Morel Decl. ¶ 48.

22.  Moyal Aff. ¶ 13.

although Morel acknowledges that the web site was among the assets sold to 1–800— is the record owner of the domain name registration.[23]

*The Complaint and Subsequent Events*

Morel's tinkering with the 1–800 web site, in conjunction with the adversary proceeding brought by PSI, precipitated this lawsuit and the present motion. The complaint here contains two claims for relief. The first seeks damages for fraud on the theory that Morel made a series of deliberate misrepresentations in the inducement of the purchase agreement. The second seeks an injunction restraining Morel from interfering in its business in general and the web site in particular.

Subsequent to the making of the present motion, the Official Committee of Unsecured Creditors of Popsmear, Inc. (the "Committee") intervened in the PSI adversary proceeding as a plaintiff, adopted PSI's complaint, and added an additional cause of action seeking to set aside the PSI–1–800 transaction pursuant to Section 548 of the Bankruptcy Code[24] as a fraudulent conveyance.

*Discussion*

**A. The Preliminary Injunction Motion**

■ A party seeking a preliminary injunction must demonstrate that it (1) is threatened with irreparable injury absent an injunction and (2) either (a) is likely to prevail on the merits or (b) has raised serious questions going to the merits and the balance of hardships tips decidedly in its favor.[25]

**1. The Web Site**

**(a) Irreparable injury**

■ There is little doubt that Morel's interference with the 1–800 web site threatens plaintiff with irreparable injury. It is undisputed that 1–800 "can no longer make changes to the Website to reflect its current marketing strategies and promotions, and it cannot create mailboxes for new employees."[26] Its revenues have dropped, apparently as a result. And while the loss of revenue theoretically might be compensated with damages, the difficulty in determining the amount of revenue that would have been generated if 1–800 retained control over its own web site renders the threat of such injury irreparable for the purpose of granting equitable relief.[27]

**(b) Likelihood of success on the merits**

Turning to the merits, the first question is whether 1–800 has demonstrated a sufficient prospect of success with respect to its claim that Morel's changing of the pass-

---

**23.** *See id.*
Morel contends that his change of the password has not affected 1–800's ability to send and receive e-mail. Morel Decl. ¶ 49. He does not deny, however, that he is the registered owner of the domain name, that only the registered owner may create or change the password, and that his change in the password has deprived 1–800 of the ability to make administrative changes to the web site and to create e-mail mail boxes.

**24.** 11 U.S.C. § 548.

**25.** *See, e.g. Alliance Bond Fund v. Grupo Mexicano de Desarrollo, S.A.* 143 F.3d 688, 696 (2d

Cir.1998), *rev'd on other grounds*, 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999).

**26.** Moyal Aff. ¶ 13.

**27.** *See, e.g., Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 38 (2d Cir.1995); *Foundry Services, Inc. v. Beneflux Corp.*, 206 F.2d 214, 216 (2d Cir.1953) (Hand, J., concurring) (injury is irreparable "it [it] includes the impossibility of ascertaining with any accuracy the extent of the loss"); *New Line Cinema Corp. v. Bertlesman Music Group., Inc.*, 693 F.Supp. 1517, 1524 (S.D.N.Y.1988).

word controlling access to the web site was wrongful. This in turn depends upon whether the right to change the password was among the assets sold by PSI to 1–800.

■ The purchase agreement here at issue is, at best, vague and imprecise. It purported to transfer "the assets of the business" without, for the most part, enumerating what those assets were. Hence, it is entirely appropriate to consider parol evidence,[28] and no one suggests otherwise. That evidence removes any question, if question there otherwise would have been, that PSI was obliged to transfer the web site to 1–800. Morel has admitted as much. And the web site consisted of the registration that carried the right to use the www.1800postcards.com domain name as well as the software that is displayed on and controls the site and whatever contracts there may have been with the company that hosted the web site. Accordingly, assuming that PSI owned the domain name registration at the time of the closing, that registration was, or at any rate should have been, assigned to 1–800.

It is not entirely clear whether the registration was owned by PSI or Morel. The firm hosting the web site told Moyal that Morel is the listed registrant of the domain name, thus implying that legal title belonged to Morel rather than PSI. But this nuance makes little difference for present purposes. Both Morel and PSI were parties to the purchase agreement. PSI agreed to sell "the assets of the business known as 1–800–POSTCARDS, (the 'Assets'),"[29] including the web site. The parties quite likely understood that the domain name registration for the web site was among the "assets of the business" irrespective of whether record title was in PSI or its sole shareholder, Morel. Morel as well as PSI warranted and represented that PSI owned and had good marketable title "to the 'Assets,'"[30] thus at least arguably assuring 1–800 that the domain name registration belonged to PSI. Morel as well as PSI covenanted to "execute and deliver such further instruments, and to take such further actions, as may be reasonably necessary and proper to effectuate and carry out the transactions contemplated" by the purchase agreement.[31] In consequence, there is every reason to believe that record ownership by Morel of the domain name registration, if that indeed is the state of the title, ultimately would not suffice to defeat 1–800's claim that its rights to that registration are paramount to Morel's.[32]

Assuming that 1–800 is the equitable owner of the domain name registration, as seems quite likely, Morel's change of the password is indefensible. Certainly his contentions that he is entitled to control the web site as a 50 percent stockholder in

---

**28.** *E.g., Investors Ins. Co. of America v. Dorinco Reins. Co.,* 917 F.2d 100, 104 (2d Cir. 1990).

**29.** Moyal Aff. Ex. A, ¶ 1.

**30.** *Id.* ¶ 9(c).

**31.** *Id.* ¶ 19.

**32.** This would follow on any of several theories. For example, Morel's warranty and representation that PSI owned all of the Assets quite likely estops him to contend otherwise. *See Sabo v. Delman,* 3 N.Y.2d 155, 162, 164 N.Y.S.2d 714, 718–19, 143 N.E.2d 906 (1957); *In Matter of Myers v. Key Bank, N.A.,* 113 A.D.2d 244, 245, 495 N.Y.S.2d 755, 757 (3d Dept.1985), *aff'd,* 68 N.Y.2d 744, 506 N.Y.S.2d 327, 497 N.E.2d 694 (1986). Further, he at least arguably is obliged to convey the registration by the covenant for further assurances. *See Chesapeake Beach Railway Co. v. Washington, Potomac & Chesapeake Railroad Co.,* 199 U.S. 247, 251, 26 S.Ct. 25, 50 L.Ed. 175 (1905); *Ernst v. Parsons,* 1876 WL 11241 (Sup.Ct.N.Y.Co.1876).

1–800 and as marketing consultant[33] are frivolous in view of the fact that the purchase and shareholders' agreements make crystal clear that Moyal is to have total control over the business, to the exclusion of Morel, and that Morel's role as marketing consultant was to be purely advisory.

■ Morel's next effort to defeat the motion on the merits is his contention that this action was not properly commenced by 1–800, as its commencement was not approved by the board (of which Morel and Moyal are the only members) and Moyal, as president, did not have authority to cause the corporation to bring the suit. He relies on this Court's decision in *Management Technologies, Inc. v. Morris.*[34] But he is seriously mistaken. Indeed, *Management Technologies* stands for the proposition that the president of a corporation faced with a deadlocked board has implied authority in emergency situations to take actions necessary to protect the corporation that otherwise would require board action.[35] That is precisely the case here. Morel, a 50 percent shareholder and one of two members of the board, is engaged in tortious conduct that is injuring the corporation. In such circumstances, Moyal, as president, has implied authority to protect the company by appropriate means, including the institution of this lawsuit.

■ Finally, Morel contends that 1–800 has breached the purchase agreement by failing to pay the last $10,000 of the purchase price, firing him, and failing to satisfy certain of his debts. But this does not justify his actions. While a breach that goes to the heart of a contract permits the non-defaulting party to cease performance,[36] it is far from clear that Morel is likely to establish such a breach by 1–800. Certainly the failure to pay the last $10,000 does not rise to that level. 1–800's obligation to pay PSI's debts was not unqualified, limited as it was to payment, "to the extent possible, [of] all obligations personally guaranteed by ... Morel from future proceeds and profits of the business,"[37] and there is no proof that there have been any profits. And while the obligation to pay those of Morel's personal credit card debts as were listed on Exhibit A[38] was absolute, it appears that no such debts were listed on Exhibit A to the purchase agreement, which seems to have been a copy of the lease.[39] In any case, even a material breach would not permit Morel to interfere with the business of the allegedly defaulting party.[40]

In view of the foregoing, plaintiff has demonstrated a substantial likelihood of success on the merits. At a minimum, there are serious questions constituting fair ground for litigation.

**33.** Morel Decl. ¶ 28.

**34.** 961 F.Supp. 640 (S.D.N.Y.1997).

**35.** *Id.* at 648–49.

**36.** *See ARP Films, Inc. v. Marvel Entertainment Group, Inc.*, 952 F.2d 643, 649 (2d Cir. 1991); *Topps Chewing Gum, Inc. v. Imperial Toy Corp.*, 686 F.Supp. 402, 408–09 (S.D.N.Y. 1988), *aff'd*, 895 F.2d 1410 (2d Cir.1989).

**37.** Moyal Aff. Ex. A, ¶ 25.

**38.** *Id.*

**39.** *Id.* Ex. A, Ex. A.

**40.** *See Custard Insurance Adjusters, Inc. v. Nardi,* No. CV 980061967S, 2000 WL 562318, at *24 (Conn.Super.Apr. 20, 2000) (aggrieved party to contract could not "sabotage" business of breaching party because "time honored principle of contract law [that] allows an aggrieved party to walk away from the contract ... does not allow someone to maintain contractual relations and violate the basic requirements necessary to fulfill ongoing contractual relations ... if it did, [contractual] relations would degenerate into the law of the jungle.").

### (c) Balance of hardships

While plaintiff's likelihood of success on the merits renders consideration of the balance of hardships unnecessary, the Court nevertheless finds that the balance of hardships tips decidedly in plaintiff's favor. Morel's interference with the web site threatens plaintiff with irreparable injury. If the Court wrongly denies an injunction, 1–800 probably would be injured substantially, but in a manner very difficult to quantify and therefore to remedy by money damages. An injunction, even if wrongly issued, threatens Morel with no material harm whatever. He claims that he changed the password to straighten out a problem with his e-mail account.[41] But there is no suggestion that restoring 1–800 to control of the password would recreate any such problem. In any case, free e-mail accounts are readily available for the asking from any number of providers. Accordingly, plaintiff is entitled to a preliminary injunction restraining Morel from interfering with the web site pending the determination of the action.

### 2. Morel's 1–800 Shares

■ 1–800 seeks also an order, pursuant to Rule 65, requiring Morel to deposit his 1–800 shares with the Court, to be held as security for any damages it may recover against him in this action. There is no basis for such relief in light of the Supreme Court's decision in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc*,[42] which held that district courts lack authority to issue preliminary injunctions restraining defendants' unencumbered assets in order to ensure the collectability of any money damages that plaintiffs may obtain.

### B. Withdrawal of the Reference

■ As noted above, the gravamen of the adversary proceeding is PSI's claim that 1–800 and Moyal have breached the purchase agreement by failing to pay the final $10,000 of the purchase price, failing to pay certain debts that allegedly became its responsibility under the purchase agreement, and discharging Morel. The complaint seeks damages, specific performance, and rescission, although PSI, if it prevails, obviously will have to elect its remedy.

A Court "may withdraw any case or proceeding [referred to the bankruptcy court] on its own motion or by motion of any party, for cause shown."[43] Although Section 157 does not define "cause," the Second Circuit has noted that factors relevant to the determination include "whether the claim or proceeding is core or non-core, whether it is legal or equitable, and considerations of efficiency, prevention of forum shopping, and uniformity in the administration of bankruptcy law."[44] "A proceeding that involves rights created by bankruptcy law, or that could arise only in a bankruptcy, is a core proceeding."[45] On the other hand, "[a]n action that does not depend upon the bankruptcy laws for its existence and which could proceed in a

---

41. Morel Decl. ¶ 48.

42. 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999).

43. 28 U.S.C. § 157(d).

44. *In re Orion Pictures Corp.*, 4 F.3d 1095, 1101 (2d Cir.1993), *cert. dismissed*, 511 U.S. 1026, 114 S.Ct. 1418, 128 L.Ed.2d 88 (1994).

45. *In re Green*, 200 B.R. 296, 298 (S.D.N.Y. 1996) (citing 28 U.S.C. § 157 (1988); *Matter of Wood*, 825 F.2d 90, 97 (5th Cir.1987); *Nat'l City Bank v. Coopers and Lybrand*, 802 F.2d 990, 994 (8th Cir.1986); *In re Burger Boys, Inc.*, 183 B.R. 682 (S.D.N.Y.1994)).

court that lacks federal bankruptcy jurisdiction is non-core." [46]

The requirement in 28 U.S.C. § 157(c)(1) that a district court review *de novo* bankruptcy court decisions concerning non-core matters renders jury trials in non-core bankruptcy proceedings a contravention of the Seventh Amendment.[47] A bankruptcy court, however, may hold a jury trial in a core proceeding.[48] Thus, although the core/non-core determination is not dispositive of a motion to withdraw the reference,[49] "it is upon this issue that questions of efficiency and uniformity will turn," [50] particularly when a party has requested a jury trial.

Here, there is no doubt at all that the adversary proceeding brought in the Bankruptcy Court by PSI is a conventional breach of contract action that does not depend in any respect on the bankruptcy laws and that could have been brought in another court. It therefore is a non-core proceeding.[51] As PSI there seeks damages for breach of contract, 1–800 and Moyal are entitled to a jury trial on the claim. Both have requested a jury trial and neither has consented to final resolution of the non-core matter by the Bankruptcy Court.[52] Withdrawal of the reference thus would solve the constitutional problems that would arise were the adversary action to proceed to trial.

Both Morel and the intervenor Committee acknowledge all of the foregoing. They contend, however, that the Committee's interposition of a fraudulent conveyance claim after the making of the motion to withdraw the reference requires denial of the motion on the theory that the fraudulent conveyance claim is a core matter in which the Bankruptcy Court may conduct a jury trial.

The Committee's premises—that the fraudulent conveyance claim is core and that the Bankruptcy Court may conduct a jury trial on that claim—are correct, but its conclusion does not follow, at least in this case. The reference of the core proceeding may be withdrawn in the interests of efficiency when it presents an "overlapping of facts, transactions, and issues" with a case pending before the district court.[53] The facts, transactions and issues underlying the Committee's complaint overlap with those underlying PSI's non-core claims in the adversary proceeding as well as 1–800's claims here. Accordingly, efficiency counsels withdrawing the referral of the Committee's claims.[54]

**46.** *Id.* (citing *In re Guild and Gallery Plus, Inc.*, 72 F.3d 1171, 1178 (3d Cir.1996); *In re Gardner*, 913 F.2d 1515, 1518 (10th Cir.1990); *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1389 (2d Cir.1990); *In re Colbert*, 117 B.R. 51, 53 (Bankr.D.Conn.1990)).

**47.** *See In re Orion Pictures*, 4 F.3d at 1101.

**48.** *See In re Ben Cooper, Inc.*, 896 F.2d 1394 (2d Cir.), *vacated and remanded,* 498 U.S. 964, 111 S.Ct. 425, 112 L.Ed.2d 408 (1990), *reinstated on remand,* 924 F.2d 36 (2d Cir.), *cert. denied,* 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 126 (1991).

**49.** *See In re Orion Pictures*, 4 F.3d at 1101–1102; *In re Almac's, Inc.*, 202 B.R. 648, 657 (D.R.I.1996); *In re Wedtech Corp.*, 81 B.R. 237, 239 (S.D.N.Y.1987).

**50.** *In re Orion Pictures*, 4 F.3d at 1101.

**51.** The fact that a recovery on behalf of PSI would expand the bankrupt estate does not alter this conclusion. *See id.* at 1102.

**52.** *See* Moyal Aff. ¶ 2. 1–800 stated at oral argument that it had requested a jury trial.

**53.** *In re Wedtech*, 81 B.R. at 239.

**54.** *See id.* (withdrawing reference in core adversary proceeding in interest of judicial economy); *see also In re Green*, 200 B.R. at 299 (withdrawing reference to entire adversary proceeding for sake of efficiency in light of decision to withdraw reference of one complaint within proceeding).

*Conclusion*

For the foregoing reasons, plaintiff's motion for a preliminary injunction and to withdraw the reference is granted to the extent that

1. Defendant is hereby enjoined and restrained, pending the hearing and determination of this action, from:

(a) Interfering in any way with plaintiff's control of the 1800Postcards web site (the "Web Site");

(b) Declining to provide plaintiff with such information, passwords, and documents as may be required to ensure that plaintiff has and retains full control over the Web Site;

(c) Adding, deleting or altering any part of the Web Site, provided, however, that nothing in this subparagraph shall bar defendant from accessing, downloading and deleting electronic mail messages addressed to him from his own electronic mail box; and

(d) Accessing the Web Site for any administrative or operational purpose, and

2. The reference is withdrawn with respect to the adversary proceeding by PSI and the Committee against 1–800 and Moyal, Bankr.S.D.N.Y. Adv. Proc. 01–2512.

The motion is denied in all other respects.

SO ORDERED.