**Arnold ZAHN, as Trustee of the Almac's Creditor Litigation and Distribution Trust, Plaintiff,**

v.

**YUCAIPA CAPITAL FUND, Yucaipa Capital Advisors, Inc., Yucaipa Almac's Partners, L.P., Almac's Partners, L.P., The Yucaipa Companies, Yucaipa Companies, Yucaipa Management Company, Ronald W. Burkle, Joe S. Burkle, Mark A. Resnik, Richard d'Abo, Citicorp Securities Markets, Inc., Citicorp North America, Inc., and Citibank, N.A., Defendants.**

C.A. No. 96–684L.

United States District Court, D. Rhode Island.

Feb. 24, 1998.

---

See also 202 B.R. 648.

Matthew J. McGowan, Salter, McGowan &
Swartz, Inc., Providence, RI, Timothy J.
Hurley, Stephen D. Lerner, Raymond W.

Lembke, Timothy C. Sullivan, Taft, Stettinius & Hollister, Cincinnati, OH, for Plaintiff.

Matthew F. Medeiros, Medeiros Karmen & Sanford, Inc., Providence, RI, Robert J. Rosenberg, James E. Brandt, Latham & Watkins, New York City, for Yucaipa Defendants.

Joseph V. Cavanagh, Jr., Blish & Cavanagh, Providence, RI, R. Paul Wickes, James R. Warnot, Jr., Richard A. Lingg, Shearman & Sterling, New York City, for Citicorp Defendants.

## OPINION AND ORDER

LAGUEUX, Chief Judge.

This case arises from the leveraged buyout ("LBO"), and subsequent petition for reorganization under Chapter 11 of the United States Bankruptcy Code, of Almac's Inc. and Almac's Supermarkets, Inc. (collectively "Almac's"). By this action, Arnold Zahn, as the trustee of the Almac's Creditor Litigation and Distribution Trust (the "Trustee"), seeks to set aside transfers made to the various defendants in connection with the LBO as fraudulent under Rhode Island law.

The case is now before this Court[1] on the motions of the Yucaipa Defendants[2] and the Citicorp Defendants[3] to dismiss pursuant to Federal Rules of Procedure 9(b) and 12(b)(6), or, in the alternative, to transfer the case to the Central District of California. Despite defendants' valiant efforts, their numerous and complex arguments are all without merit. With apologies to Shakespeare, defendants' tale is "full of sound and fury, in the end signifying nothing."[4] For the reasons that follow, the motions of both the Yucaipa Defendants and the Citicorp Defendants are denied in their entirety.

## I. Background

The Court's prior opinion provides an extensive review of the facts in this case. *See In re Almac's,* 202 B.R. at 651–53. Familiarity with these facts is assumed, and their duplication here is unnecessary. The only additional fact pertinent to the present dispute is that on September 25, 1995, New Almacs Inc. (the "Purchaser"), the purchaser of Almac's assets under the Third Amended Consolidated Chapter 11 Plan of Reorganization for Almac's (the "Plan"), itself filed a petition for Chapter 11 reorganization. At the time it filed the petition, the Purchaser had not paid anything on the $3,000,000 Junior Subordinated Obligation to Almac's unsecured creditors, as referenced in the Disclosure Statement in Support of the Second Consolidated Plan of Reorganization for Almac's (the "Disclosure Statement"). *See id.* at 652. In addition, the Purchaser's own disclosure statement indicates that the Trustee, as claim holder for Almac's unsecured creditors under the Junior Subordinated Obligation, will receive no distribution under the Purchaser's Plan.

On April 11, 1997, both the Yucaipa Defendants and the Citicorp Defendants filed separate motions to dismiss. Both groups of defendants argued that the Trustee's Complaint should be dismissed because: (1) the Uniform Fraudulent Transfer Act ("UFTA") does not apply to transfers made in connection with an "above-board" or not otherwise intentionally fraudulent LBO, and the Complaint failed to plead the existence of such fraud; (2) the constructive fraudulent transfer provisions of UFTA § 4 are not available to creditors whose claims arose after a well-publicized LBO; (3) the Complaint failed to plead sufficiently the existence of an unpaid creditor at the time of the LBO who remained unpaid at the time of the Chapter 11

1. This case has previously been the subject of an opinion by this writer. *See Zahn v. Yucaipa Capital Fund (In re Almac's, Inc.),* 202 B.R. 648 (D.R.I.1996) (withdrawing the reference to the bankruptcy court).

2. "Yucaipa Defendants" refers to the same group of defendants so identified in the Court's previous opinion in this case. *See In re Almac's,* 202 B.R. at 650 n. 1. The Court notes that these defendants continue to assert that "Yucaipa Companies" does not exist. The Court further

notes that Mark A. Resnik passed away in early 1997. Mr. Resnik's estate is represented in this action by counsel for the Yucaipa Defendants.

3. "Citicorp Defendants" refers to the same group of defendants so identified in the Court's previous opinion in this case. *See In re Almac's,* 202 B.R. at 650 n. 2.

4. William Shakespeare, Macbeth, act V, scene v.

petition; (4) the Complaint failed to plead sufficiently the UFTA elements of Almac's insolvency or unreasonably small assets; (5) the transfers in connection with the LBO constituted "settlement payments" not subject to avoidance under 11 U.S.C. § 546(e); and (6) any recovery by the Trustee would constitute a prohibited "double recovery" under 11 U.S.C. § 550(d)[5]. The Citicorp Defendants made the additional argument that the Complaint failed to plead sufficiently the UFTA element that the transfers made to the Citicorp Defendants in connection with the LBO were for less than reasonably equivalent value.

The Yucaipa Defendants argued further that in lieu of dismissal, the case should be transferred to the United States District Court for the Central District of California.[6]

The Trustee vigorously contests each of the grounds for dismissal, and maintains that the case should remain in Rhode Island. The Trustee also has offered to amend the Complaint in the event that the Court finds that, as defendants argue, the pleading is insufficient.

At the hearing of defendants' motions, the Court invited further memoranda on the unresolved threshold issue of whether the Trustee had standing under the Bankruptcy Code to bring the Complaint. After hearing oral argument on the remaining issues, the Court took the matter under advisement.

On June 26, 1997, defendants filed a joint memorandum arguing that the Trustee did not have standing under 11 U.S.C. §§ 550(a) and 1123(b)(3)(B) because any recovery by the Trustee on the avoidance claims would primarily, if not exclusively, benefit the Purchaser. The Trustee rejoined that such a recovery would in fact benefit primarily the unsecured creditors, and thus his standing has been established.

The Court having considered the parties' arguments, the matter is now in order for decision.

II.  Trustee's Standing

■  The Court first addresses the threshold issue of the Trustee's standing under the Bankruptcy Code. The burden of proof must be carried by the party whose standing is questioned. *United States v. AVX Corp.*, 962 F.2d 108, 114 (1st Cir.1992).

Under the Code, the bankruptcy trustee has the power during the pendency of the bankruptcy to avoid "any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim ...." 11 U.S.C. § 544(b). Where the trustee succeeds in an avoidance claim, he may "recover, for the benefit of the estate, the property transferred ...", or the value of such property from the initial, immediate, or mediate transferee. 11 U.S.C. § 550(a).

■  The power to bring such actions is unique to the trustee (or debtor in possession) in bankruptcy, and may not be assigned. *See Kroh Bros. Dev. Co. v. United Missouri Bank of Kansas City, N.A. (In re Kroh Bros. Dev. Co.)*, 100 B.R. 487, 499 (Bankr.W.D.Mo.1989) (citing cases) (*"Kroh I"*), *appeal denied*, 101 B.R. 1000 (W.D.Mo. 1989) (*"Kroh II"*). However, 11 U.S.C. § 1123(b)(3)(B) states that a Chapter 11 reorganization plan may "provide for ... the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any ... claim or interest" belonging to the debtor or the estate. Thus, "[i]t is a well-settled principle that avoidance powers may be assigned to someone other than the debtor or trustee pursuant to a plan of reorganization." *Winston & Strawn v. Kelly (In re Churchfield Management & Inv. Corp.)*, 122 B.R. 76, 81 (Bankr.N.D.Ill.1990)(citing *Kroh II*, 101 B.R.

---

**5.**  While the two groups of defendants' arguments were not identical at that time, they were essentially the same. Indeed, at the hearing on these motions the Citicorp Defendants adopted all of the Yucaipa Defendants' arguments as their own. The Citicorp Defendants made an additional argument for dismissal, discussed *infra*.

**6.**  While the Citicorp Defendants did not initially make this argument, they subsequently adopted it as well.

at 1005); *see also McFarland v. Leyh (In re Texas Gen. Petroleum Corp.)*, 52 F.3d 1330, 1335 (5th Cir.1995)(§ 1123(b)(3)(B) "allows a plan to transfer avoidance powers to a party other than the debtor or the trustee."); *Briggs v. Kent (In re Professional Inv. Properties of America)*, 955 F.2d 623, 626 (9th Cir.1992) (same); *Citicorp Acceptance Co. v. Robison (In re Sweetwater)*, 884 F.2d 1323, 1327 (10th Cir.1989) (same).

Pursuant to § 1123(b)(3)(B), a party, other than the debtor or the trustee, who seeks to prosecute avoidance claims must establish that: (1) it has been appointed; and (2) it is a representative of the estate. *See, e.g., In re Texas Gen. Petroleum Corp.*, 52 F.3d at 1335; *Retail Marketing Co. v. King (In re Mako, Inc.)*, 985 F.2d 1052, 1054 (10th Cir.1993); *Fleet Nat'l Bank v. Doorcrafters (In re North Atlantic Millwork Corp.)*, 155 B.R. 271, 281 (Bankr.D.Mass.1993).

The first element does not appear to be in serious dispute in this case. "The bankruptcy court's approval of a plan that clearly appoints a stranger to the estate satisfies the first element." *In re Texas Gen. Petroleum Corp.*, 52 F.3d at 1335. This is precisely the case here. Paragraph 8.3 of the Plan states:

> On and as of the Effective Date, the Debtors will assign the Avoidance Claims against the Yucaipa Entities and the Citibank Entities arising directly, or indirectly, out of the Acquisition to the Creditor Litigation and Distribution Trustee ....

Clearer language could not be desired. The Plan specifically appoints this plaintiff to bring these claims. The Bankruptcy Court entered its order confirming the Plan on November 8, 1994. Thus, the first element of the § 1123(b)(3)(B) standing test is met.

The real dispute involves the second element of the test, *i.e.*, whether the Trustee is a "representative of the estate". Courts determine whether this element is met on a case-by-case basis. *See, e.g., In re Texas Gen. Petroleum Corp.*, 52 F.3d at 1335; *In re North Atlantic Millwork Corp.*, 155 B.R. at 281; *Temex Energy, Inc. v. Hastie and Kirschner (In re Amarex, Inc.)*, 96 B.R. 330, 334–35 (W.D.Okl.1989). "The

primary concern is whether a successful recovery by the appointed representative would benefit the debtor's estate and particularly the unsecured creditors." *In re Sweetwater*, 884 F.2d at 1326–27 (internal quotation and citations omitted).

This question has spawned much litigation, with varying results. Generally, however, courts have interpreted "benefit" broadly. *See In re North Atlantic Millwork*, 155 B.R. at 282; *In re Churchfield*, 122 B.R. at 83. "[T]he focus is on whether the assignment is for the sole benefit of a stranger to the estate as an assignee or is for the benefit of parties in interest, especially unsecured creditors." *In re North Atlantic Millwork*, 155 B.R. at 282.

Several courts have found a sufficient benefit to the estate where a purported representative's successful avoidance recovery would increase the value of a plan's distributions to unsecured creditors. *See In re Amarex*, 96 B.R. at 334–35 (where reorganization plan granted unsecured creditors stock in parent company of debtor's successor, successor's avoidance action would benefit creditors by increasing successor's worth and thereby increasing value of creditors' stock in parent); *DuVoisin v. East Tennessee Equity, Ltd. (In re Southern Indus. Banking Corp.)*, 59 B.R. 638, 641 (Bankr. E.D.Tenn.1986) ("[c]learly, to the extent that plaintiff's recovery of fraudulent transfers and preferences operates to increase the assets and financial health of the successor-in-interest, it also operates to proportionally increase the value of those ownership rights in the successor-in-interest which constitute a portion of the unsecured creditors' distribution under the plan.").

Similarly, courts have held that the estate benefits where an avoidance recovery by the debtor's successor in reorganization would increase the successor's assets, thus increasing the likelihood of unsecured creditors actually receiving the amounts due under the plan. *See In re Amarex*, 96 B.R. at 335; *Tennessee Wheel & Rubber Co. v. Captron Corporate Air Fleet (In re Tennessee Wheel & Rubber Co.)*, 64 B.R. 721, 726 (Bankr. M.D.Tenn.1986), *aff'd sub nom. Tennessee Wheel & Rubber Co. v. American Express*

*Travel Related Services Co., Inc.*, 75 B.R. 1 (M.D.Tenn.1987). These courts have reasoned that even if an avoidance recovery would not increase the specific amounts that unsecured creditors would receive, it would increase the successor's resources and thus increase the likelihood that the unsecured creditors would recover at all. *Id.*

In addition, courts have found that the "benefit to the estate" may occur prior to an avoidance recovery. *See Official Committee of Unsecured Creditors of Maxwell Newspapers, Inc. v. MacMillan, Inc. (In re Maxwell Newspapers, Inc.)*, 189 B.R. 282, 287 (Bankr. S.D.N.Y.1995) (estate benefited where plaintiff was granted right to pursue avoidance claims in exchange for withdrawing $93,000,-000 in claims against the estate); *In re Churchfield*, 122 B.R. at 82–83 (estate benefited where reorganization plan gave plaintiff right to pursue avoidance claims, in exchange for payment to two funds, one for direct distribution to creditors and one for payment of estate's administrative expenses).

■ In accordance with this broad concept of a benefit to the estate, it is clear, as indeed this Court has already indicated, that every dime of an avoidance recovery need not go to the unsecured creditors for the estate to benefit. *See In re Almac's*, 202 B.R. at 656; *Kroh I*, 100 B.R. at 498. In *Kroh I*, the court found that the estate would benefit from a successful avoidance recovery by the plaintiff even though the proceeds of such a recovery would be split 50–50 between the estate and the plaintiff. 100 B.R. at 498. While the unsecured creditors would not receive the *entire* recovery, the court concluded that "the substantial financial recovery ... will substantially benefit the unsecured creditors. The Court is firmly convinced that the 50–50 split ... has more than an indirect benefit to the unsecured creditors." *Id.*

Several cases hold that an avoidance recovery may not benefit solely a debtor or purchaser. *See id.* at 499 (recognizing "the long line of cases ... holding that the avoiding powers cannot be transferred to a single creditor or group of creditors for their *sole* benefit ....")(emphasis added); *see also Consolidated Pet Foods, Inc. v. Millard Refrigerated Services, Inc. (In re S & D Foods, Inc.)*, 110 B.R. 34, 36 (Bankr.D.Colo.1990). However, these cases should not be read to stand for the dramatically different proposition that an avoidance recovery *must* benefit the unsecured creditors *solely*. Nothing in 11 U.S.C. § 1123(b)(3)(B) so reads, and the case law does not so dictate.[7]

Even those courts which have expressed reservations about the concept of an indirect benefit to the estate have not gone so far as to declare that *only* the estate may benefit from an avoidance recovery in order for the "representative of the estate" prong of § 1123(b)(3)(B) to be met. *See In re S & D Foods*, 110 B.R. at 36–37; *Harstad v. First American Bank*, 39 F.3d 898, 905 (8th Cir. 1994)[8].

---

**7.** Defendants rely heavily on the bankruptcy court's opinion in *Retail Marketing Co. v. Northwest Nat'l Bank (In re Mako, Inc.)*, 120 B.R. 203, 211 (Bankr.E.D.Okla.1990), in which the court stated, "[f]or a party to be a true 'representative of the estate' *any and all* proceeds realized from the prosecution of the avoidance actions must be paid to the creditors of the estate ...." However, the Tenth Circuit, in its opinion in a related adversary proceeding in the same bankruptcy case, did not adopt such a rule. *See In re Mako*, 985 F.2d at 1056. That court stated only that the plaintiff was not a representative of the estate because a recovery would benefit *only* the plaintiff. *Id.*

Moreover, defendants' assertion that "the Tenth Circuit Court of Appeals expressly adopted the bankruptcy court's reasoning on this issue ..." is misguided. The Tenth Circuit noted in a footnote that while the bankruptcy court's opinion had been reversed in part and remanded, the bankruptcy court's reasoning on the "appoint-

ment" prong of the § 1123(b)(3)(B) test was unaffected. *Id.* at 1055 n. 3. It is a stretch to assert, as defendants do, that this constitutes an "express adoption" of the bankruptcy court's reasoning on an entirely separate issue, i.e., the "representative of the estate" prong of the § 1123(b)(3)(B) test, to which the Tenth Circuit was not referring in that footnote. While the Tenth Circuit did not reverse the bankruptcy court's decision with respect to the "representative of the estate" prong, neither did it "expressly adopt" the "any and all" language.

**8.** Defendants quote *Harstad v. First American Bank (In re Harstad)*, 155 B.R. 500, 511 (Bankr. D.Minn.1993), as follows: "Congress carefully articulated its desire in section 550, artfully making sure that it was the estate, i.e., creditors, and not the debtor [or any other party] who benefits from any preference recovery." To begin with, defendants' addition of "or any other party" in brackets arguably changes the meaning of the

In the present case, the Plan provides for the distribution of the proceeds of a successful avoidance recovery. *See In re Almac's,* 202 B.R. at 652.

> "[T]he proceeds will be distributed first to reimburse New Almacs for $500,000 to be advanced by New Almacs to the Creditors Litigation and Distribution Trustee on the Effective Date and to pay the costs of the litigation in excess of the funded costs, to a maximum of $500,000; next to a bonus fee provided to professionals hired to pursue the litigation and to the payment of the unpaid portion of the $3.0 million New Almacs Junior Subordinated Obligation; next to the repayment to New Almacs of its payments on the New Almacs Junior Subordinated Obligation; next to remaining litigation costs; and last to be split 75% to the Class 3A Claimants [the unsecured creditors] and 25% to New Almacs."

*Id.* "In essence, from any recovery under the avoidance claims, the Trustee would have to pay approximately $3.0 million to the Purchaser as well as legal fees and expenses, before the unsecured creditors began to receive their 75% share of the proceeds." *Id.*

Defendants argue that an avoidance recovery would not benefit the estate, because the unsecured creditors would receive none of the first several million dollars of such a recovery. Indeed, they claim, the Creditors' Litigation and Distribution Trust is designed to allow the Purchaser to recoup its payments, rather than to benefit the unsecured creditors.

Defendants minimize the fact that the Purchaser has filed for bankruptcy protection, has not paid anything on the $3,000,000 Junior Subordinated Obligation, and that its Plan does not designate the Trustee, as claim holder for Almac's unsecured creditors under the Junior Subordinated Obligation, for a distribution. The significance of these facts, however, is that the $3,000,000 to which the Purchaser would have been entitled under the Plan, as proceeds from a successful pros-

ecution of these avoidance claims by the Trustee, was meant as reimbursement for the $3,000,000 that the Purchaser was to have paid on the note to the unsecured creditors. Because the Purchaser will not have paid on the note, therefore, it will not be entitled to $3,000,000 from a recovery on the present claims by the Trustee. As a result, the amount of such a recovery to which the unsecured creditors would be entitled is increased.

Defendants argue that this is irrelevant, because the Trust suffers a "fatal structural defect" in serving to benefit primarily the Purchaser. They urge the Court to focus on the first few million dollars to be distributed under the Plan, and to find that because the unsecured creditors will receive none of that amount, the estate will not benefit.

■ This argument misses the point entirely. Should the Trustee succeed in this action, the unsecured creditors will gain up to $33 million, less attorney's fees. *See In re Almac's,* 202 B.R. at 656. Should the Trustee be precluded from bringing this action, the unsecured creditors will not receive that amount. The argument that a successful recovery by the Trustee would not benefit the estate, "and particularly the unsecured creditors", strains credulity. That the unsecured creditors will not receive every last dime of a successful recovery does not, as discussed at length *supra,* mean that such a recovery would not benefit the estate. *See In re Almac's,* 202 B.R. at 656; *Kroh I,* 100 B.R. at 498.

Moreover, defendants' attempt to distinguish this case from others like it on the ground that under the Plan as originally confirmed, *none* of the first several million dollars would go to the unsecured creditors cannot be taken seriously. The Trustee's success in this action would mean that the transfers at issue would be avoided—in their entirety. The order in which the proceeds would be distributed does not change the

---

quotation. Furthermore, the Eighth Circuit, in affirming the bankruptcy court in that case, cited *Kroh I,* 100 B.R. 487, in support of the proposition that a § 1123(b)(3)(B) plaintiff need not demonstrate a direct benefit to the estate in the form of a distribution of the proceeds of a prefer-

ence recovery. *See Harstad v. First American Bank,* 39 F.3d at 905. That the Eighth Circuit so cited a case, in which the estate was held to benefit even though it received only 50% of the proceeds of such a recovery, indicates that support for the defendants' position is precarious.

basic issue of whether the estate, and particularly the unsecured creditors, would benefit from a victory by the Trustee. They very clearly would, and standing, thus, is evident in this case.

## III.   Motions to Dismiss

### A.   Standard for Decision

■   Fed.R.Civ.P. 12(b)(6) provides for dismissal where the plaintiff has failed to state a claim upon which relief may be granted. Dismissal on such grounds is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

■   In considering a motion to dismiss, a court must accept all well-pleaded factual averments as true, and draw all reasonable inferences therefrom in the plaintiff's favor. *See Negron–Gaztambide v. Hernandez–Torres*, 35 F.3d 25, 27 (1st Cir.1994); *Iacampo v. Hasbro Inc.*, 929 F.Supp. 562, 570 (D.R.I.1996). "While a complaint need only set out 'a generalized statement of facts,' there must be enough information 'to outline the elements of the pleaders' claim.'" *Kadar Corp. v. Milbury*, 549 F.2d 230, 233 (1st Cir.1977) (quoting Wright & Miller, Federal Practice & Procedure: Civil § 1357).

### B.   Analysis

### 1.   Choice of Law

Plaintiff's fraudulent transfer claims are based on Rhode Island's version of the UFTA, R.I. Gen. Laws §§ 6–16–1 to 12. However, defendants argue that California's version of the UFTA, Cal. Civ.Code § 3439, should govern. Both parties address the relevant contacts of Rhode Island and California with this case, contending that the law of one state or the other should govern.

However, if there is no conflict between the two states' laws, then the Court need not engage in a choice-of-law analysis. The California and Rhode Island versions of the UFTA are for all practical purposes identical[9]. Defendants argue, however, that: (1) Cal. Civ.Code § 3439 does not apply to LBOs that are "above board" or not otherwise intentionally fraudulent; and (2) a creditor whose claim arises after the consummation of an LBO may not bring a constructive fraudulent transfer claim under Cal. Civ.Code § 3439.04[10] where the LBO was highly publicized and was not "actually" fraudulently concealed.

■   While neither the California Supreme Court nor the Rhode Island Supreme Court have considered these issues, defendants argue that Ninth Circuit cases interpreting the California Uniform Fraudulent Conveyances Act ("UFCA") in a manner supporting their arguments represent the law of California[11]. Defendants then apparently

---

**9.** The UFTA was approved by the National Conference of Commissioners on Uniform State Laws in 1984, and has been enacted in thirty-six states. *See* 7A U.L.A. 639 (1985 F.Supp.1997).

**10.** Cal. Civ.Code § 3439.04, based on UFTA § 4, 7A U.L.A. 652–53 is entitled "Transfers fraudulent as to present and future creditors", and reads:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:

(a) With actual intent to hinder, delay, or defraud any creditor of the debtor.

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(1) Was engaged or was about to engage in a business or a transaction for which the re-

maining assets of the debtor were unreasonably small in relation to the business or transaction; or

(2) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

**11.** Defendants doggedly contend that these cases are "controlling", "dispositive", "binding", and "definitive". It is hornbook law that they are none of the above. *Comm'r of Internal Revenue v. Estate of Bosch*, 387 U.S. 456, 464–65, 87 S.Ct. 1776, 1782–83, 18 L.Ed.2d 886 (1967); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Moores v. Greenberg*, 834 F.2d 1105, 1107 (1st Cir.1987). Binding interpretations of state laws are made by state supreme courts, not by federal circuit courts. *Id.* Thus, while the Ninth Circuit cases may be the controlling interpretation of California law in the federal courts of the Ninth Circuit, *see Pajaro*

assume that application of Rhode Island's UFTA would produce a different result; hence the presumed conflict of laws[12]. Plaintiff also appears to assume a conflict.

This Court, however, is bound to determine if a conflict in fact exists. As a federal court applying state law, the Court must attempt to determine the results to which the supreme courts of California and Rhode Island would come. *Comm'r of Internal Revenue v. Estate of Bosch,* 387 U.S. 456, 464–65, 87 S.Ct. 1776, 1782–83, 18 L.Ed.2d 886 (1967); *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Moores v. Greenberg,* 834 F.2d 1105, 1107 (1st Cir.1987). Specifically, the Court must determine whether the respective state supreme courts would adopt the reasoning and rule of the Ninth Circuit cases.

### a. The Ninth Circuit cases

In *Credit Managers Ass'n of Southern California v. The Federal Co.,* 629 F.Supp. 175 (C.D.Cal.1986), the District Court confronted the question of how to apply California's constructive fraudulent conveyance laws to an LBO. Since the parties had not briefed the "important conceptual question" of whether fraudulent conveyance law applied to LBOs at all, the Court did not decide it. Nevertheless, in *dicta,* the Court endorsed the arguments presented in a law review article[13], to the effect that allowing fraudulent-transfer attacks on failed LBOs would have a "chilling" effect on such transactions, which differed from the classic fraud activity at which fraudulent conveyance laws were aimed. *Credit Managers,* 629 F.Supp. at 179–80. Even assuming fraudulent conveyance laws could be applied to LBOs, the Court continued, "only those who were creditors at the time of the transaction should have a right to attack the transaction." *Id.* at 180. The Court recognized that § 5 of the UFCA, then in effect in California (former Cal. Civ.Code § 3439.05), allowed just such an attack[14], but stated, "when the California legislature passed this provision in 1939, it clearly did not intend to cover leveraged buyouts which are very public events." *Id.* at 181. Finally, the Court cited the need to limit the application of fraudulent conveyance laws to LBOs, lest the laws become an "insurance policy for creditors". *Id.*

This *dicta* became the law of the Ninth Circuit in *Kupetz v. Wolf,* 845 F.2d 842 (9th Cir.1988). *Kupetz* featured an LBO in which the shareholders of a corporation sold their stock in a series of transactions summarized by the Ninth Circuit as follows:

(1) Adashek [the buyer] formed Little Red Riding Hood (Riding Hood), a Wisconsin corporation having $100.00 in capital;

(2) Riding Hood purchased all the shares of Wolf & Vine [the corporation]

---

*Dunes Rental Agcy., Inc. v. Spitters (In re Pajaro Dunes Rental Agcy., Inc.),* 174 B.R. 557, 572 n. 43 (Bankr.N.D.Cal.1994), they are *not* controlling anywhere else. Rather, they represent merely the Ninth Circuit's prediction of how the California Supreme Court would decide the questions at hand. *Bosch,* 387 U.S. at 464–65, 87 S.Ct. at 1782–83; *Erie,* 304 U.S. 64, 58 S.Ct. 817; *Moores,* 834 F.2d at 1107.

This Court, sitting outside the Ninth Circuit, is not bound by Ninth Circuit precedent, but instead must make an independent determination of whether the California and Rhode Island supreme courts would adopt the reasoning and rule of the Ninth Circuit cases. *See Blinzler v. Marriott Int'l, Inc.,* 81 F.3d 1148, 1151 (1st Cir.1996) ("[W]e seek guidance in analogous state court decisions, persuasive adjudications by courts of sister states, learned treatises, and public policy considerations identified in state decisional law.").

**12.** Defendants do argue that even if California law does not govern this case, the Court nevertheless is bound by R.I. Gen. Laws § 6–16–11 to apply California law. § 6–16–11 reads, "this chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to this subject of this chapter among states enacting it."

**13.** Douglas G. Baird & Thomas H. Jackson, *Fraudulent Conveyance Law and its Proper Domain,* 38 Vand. L.Rev. 829 (1985).

**14.** This section read,

Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

7A U.L.A. 504.

from Wolf and Marmon [the sellers] for $3 million, $1.1 million paid immediately and $1.9 million to be paid in installments over the next two years;

(3) Riding Hood financed the transaction with a $1.1 million loan from the Bank and the Bank issued letters of credit in favor of the sellers for the remaining amount;

(4) Riding Hood merged into Wolf & Vine; which, as the survivor corporation, assumed the obligation of Riding Hood to the sellers, Wolf and Marmon; and

(5) Wolf & Vine pledged its assets to the Bank to secure the $1.1 million loan and the letters of credit. Thus, Adashek effectively pledged the assets of Wolf & Vine to finance his acquisition of that corporation.

*Id.* at 844. Wolf & Vine subsequently filed for bankruptcy under Chapter 11, and the trustee sued to avoid the LBO as a fraudulent conveyance under the UFCA. *Id.* The District Court[15], finding that no creditor existed on the date the LBO closed, granted the defendant's motion for summary judgment. *Id.*

On appeal, the Ninth Circuit reviewed the scant pertinent case law, and concluded that "those transactions in which all was 'above board' to begin with have been 'ratified' by the courts even though the creditors may have suffered in the end." *Kupetz,* 845 F.2d at 847. The Court of Appeals then stated, "we decline to use the law of fraudulent conveyances to force the selling shareholders in this case to give up the payments they have received." *Id.* This decision was based on four factors:

First, there is no evidence of any intention on the part of the selling shareholders to defraud the corporation's creditors. Second, the selling shareholders did not know that Adashek intended to finance the purchases through an LBO. Third, the Trustee represents no creditors whose claims against the estate arose before July 31, 1979, and who did not have full opportunity

to evaluate the effect of the LBO on Wolf & Vine's creditworthiness. Fourth, the form of the transactions employed by the LBO reflects a sale by Wolf and Marmon to an entity other than Wolf & Vine.

*Id.* at 847–48.

With respect to the element of intent to defraud, the Ninth Circuit acknowledged that the plaintiff was suing under the constructive fraud provisions of the UFCA. The Court stated, however,

[a]lthough lack of fraudulent intent does not bar a fraudulent conveyance claim under a constructive intent provision of the law, we hesitate to utilize constructive intent to frustrate the purposes intended to be served by what appears to us to be a legitimate LBO.

*Id.* at 848.

Moreover, the Ninth Circuit found, even to the extent that fraudulent conveyance laws would apply to LBOs, a post-LBO creditor could not attack a well-publicized LBO. *Kupetz,* 845 F.2d at 849 n. 16. The Court noted that

[t]he California courts do not seem to have doubted the plain language of the statute that later-arising creditors may attack conveyances that meet the other requirements of the statute[16].... But like Judge Rafeedie in Credit Managers, we believe this grant of standing to sue must be modified in light of an LBO in which there was no actual intent to defraud.

*Id.* (footnote added). The Court agreed with the *dicta* in *Credit Managers* that the California legislature "clearly" did not intend the UFCA to apply to LBOs, and that policy concerns counseled against allowing post-LBO creditors to sue. *Id.*

Other Ninth Circuit cases following *Kupetz* have reiterated and explained the rules established therein. *See Lippi v. City Bank,* 955 F.2d 599 (9th Cir.1992); *Bay Plastics, Inc. v. BT Commercial Corp. (In re Bay Plastics, Inc.),* 187 B.R. 315 (Bankr.C.D.Cal.

---

**15.** The district judge in *Kupetz* was the same judge who had issued the opinion in *Credit Managers.*

**16.** The court noted that *Pope v. National Aero Finance Co.,* 236 Cal.App.2d 722, 46 Cal.Rptr. 233, 237 (1965), stated that a creditor must have had a claim on the date of the transaction to sue under UFCA § 5.

1995); *Pajaro Dunes Rental Agcy., Inc. v. Spitters (In re Pajaro Dunes Rental Agcy., Inc.)*, 174 B.R. 557 (Bankr.N.D.Cal.1994); *Kendall v. Sorani (In re Richmond Produce Co., Inc.)*, 151 B.R. 1012 (Bankr.N.D.Cal. 1993), *aff'd* 195 B.R. 455 (N.D.Cal.1996).

### b. California law

The question is whether the California Supreme Court would adopt the reasoning and rule of the aforementioned cases.

■■■■ In determining how (or indeed whether) the California Supreme Court would apply Cal. Civ.Code § 3439 to this LBO, the Court is guided by well-established California principles of statutory construction. The objective of statutory construction is to discern the intent of the legislature. *California Teachers Ass'n v. Governing Bd. of Rialto Unified School District*, 14 Cal.4th 627, 59 Cal.Rptr.2d 671, 673, 927 P.2d 1175, 1177 (1997). The first step in doing so is to "scrutinize the actual words of the statute, giving them a plain and common sense meaning." *Id.* Where statutory language has a plain meaning, courts are to apply that language as written, "whatever may be thought of the wisdom, expediency, or policy of the act". *Id.* (internal quotations omitted). Courts have "no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed." *Id.* (internal quotation omitted). "It is our task to construe, not to amend, the statute.... [or] to insert what has been omitted or omit what has been inserted." *California Fed. Savings & Loan Ass'n v. City of Los Angeles*, 11 Cal.4th 342, 45 Cal.Rptr.2d 279, 282–283, 902 P.2d 297, 300–301 (1995) (internal quotation omitted). Courts "must assume that the Legislature knew how to create an exception if it wished to do so." *Id.* 45 Cal.Rptr.2d at 283, 902 P.2d at 301 (internal quotation omitted). Finally, courts must give meaning, if possible, to every word in a statutory provision. *Dyna–Med, Inc. v. Fair Employment & Housing Comm'n*, 43 Cal.3d 1379, 241 Cal.Rptr. 67, 69–70, 743 P.2d 1323, 1326 (1987).

■■■■ Applying these principles to § 3439, this Court is confident that the California Supreme Court would not follow the Ninth Circuit cases, but rather would apply the statute as written. Limiting the reach of § 3439 to LBOs that are not "above-board" essentially limits fraudulent-transfer attacks on LBOs to those which are "actually" fraudulent, in effect writing the constructive fraudulent transfer provisions out of the statute when an LBO is involved. Clearly, § 3439 expressly allows constructive fraudulent transfer claims, and does not limit the application of such claims to particular *types* of transfers. The California legislature is quite capable of excepting LBOs from the reach of § 3439 if it so desires; there is no indication whatsoever that it intended to do so. *See California Fed. Savings & Loan Ass'n*, 45 Cal.Rptr.2d at 282–283, 902 P.2d at 300–301.

■■■ Moreover, the purported wisdom of applying § 3439 to "above board" LBOs is immaterial; the courts' role is to apply the law as the legislature has enacted it, not as the courts would prefer it. *California Teachers Ass'n*, 59 Cal.Rptr.2d 671, 927 P.2d at 1177; *see also United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1297 (3d Cir.1986) ("If the UFCA is not to be applied to leveraged buy-outs, it should be for the state legislatures, not the courts to decide."); David R. Weinstein, *From Kupetz to Lippi and Beyond; LBOs in the Ninth Circuit—Now What?*, 21 Cal. Bankr.J. 169, 191 (1993) (*Kupetz* "was not a judicial analysis of the elements and defenses of a right of action. It was a subjective narrative about what the law ought to be.")

California case law on fraudulent conveyances does not counsel to the contrary. The California courts have clearly recognized the existence of constructive fraudulent transfer claims as distinct from actual fraudulent transfer claims. *See, e.g., Lyons v. Security Pacific Nat'l Bank*, 40 Cal.App.4th 1001, 48 Cal.Rptr.2d 174, 184 (1995); *Reddy v. Gonzalez*, 8 Cal.App.4th 118, 10 Cal.Rptr.2d 55, 57–58 (1992); *Bank of California v. Virtue & Scheck, Inc.*, 140 Cal.App.3d 1026, 190 Cal. Rptr. 54, 60 (1983). The cases do not reveal any doctrine by which the California Supreme Court would write the constructive fraudulent transfer provisions out of the applicable statute with respect to particular

types of transfers. Nor do they reveal any reason why application of such provisions to transfers made in connection with an LBO would create an absurd result. *See California School Employees Ass'n. v. Governing Board,* 8 Cal.4th 333, 33 Cal.Rptr.2d 109, 115, 878 P.2d 1321, 1327 (1994) (plain language need not be followed where its application would create absurd result) (internal quotation omitted).

Based on the foregoing, this Court is not persuaded that the California Supreme Court would abandon its statutory construction principles in this case and adopt a rule limiting the application of fraudulent conveyance laws to LBOs that are not "above-board" or otherwise intentionally fraudulent [17].

With respect to the second applicable rule coming out of the Ninth Circuit cases, that post-LBO creditors may not use the constructive fraudulent transfer provision of § 3439.04 to attack a well-publicized LBO, this Court is likewise persuaded that the California Supreme Court would not craft such a rule.

§ 3439.04 is entitled "Transfers fraudulent as to present and future creditors", and reads:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, *whether the creditor's claim arose before or after the transfer was made or the obligation was incurred,* if the debtor made the transfer or incurred the obligation as follows:

(a) With actual intent to hinder, delay, or defraud any creditor of the debtor.

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor

were unreasonably small in relation to the business or transaction; or

(2) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

(emphasis added). The statutory language could not be clearer; a creditor, whose claim arose before or after the transfer in question, has a cause of action "if" the remaining statutory conditions are satisfied. Nowhere is there a list of particular types of transfers excluded from the reach of these provisions with respect to post-transfer creditors.

Again, the Ninth Circuit has essentially written the crystal-clear constructive fraudulent transfer provisions of § 3439.04 out of the statute, this time by preventing post-LBO creditors from attacking LBOs that were "well-publicized" or "not actually fraudulently concealed", regardless of whether the actual statutory provisions are satisfied. Suffice it to say that the discussion, *supra,* of California's principles of statutory construction, applies with equal or greater force here to compel the conclusion that the California Supreme Court would apply the statute as written. § 3439.04 is worded with clarity (indeed, more so than the UFCA), and it cannot be assumed that the California Supreme Court would simply ignore its proper role and eliminate portions of the statute.

*Kupetz* itself appears to concede as much. While most of that decision focused on policy concerns, the Ninth Circuit briefly passed on the question of how the California Supreme Court would rule. The Court correctly found that "[t]he California courts do not seem to have doubted the plain language of the statute that later-arising creditors may attack conveyances that meet the other requirements of the statute." 845 F.2d at 849 n. 16.[18] Incredibly, the Ninth Circuit then pro-

---

**17:** Since this Court concludes that the California Supreme Court would not find that § 3439 applies only to LBOs that are not "above board", defendants' argument that the complaint is defective in failing to plead that the LBO at hand was not "above board" or otherwise intentionally fraudulent is rejected.

**18.** The Ninth Circuit correctly observed that in *Pope v. National Aero Finance Co.,* 236 Cal.

App.2d 722, 46 Cal.Rptr. 233, 237 (1965), the California District Court of Appeal, in listing the elements of a constructive fraudulent transfer claim under the UFCA, stated that the plaintiff must have been a creditor on the date of the conveyance. However, that intermediate appellate case is not controlling, *see Comm'r v. Estate of Bosch,* 387 U.S. at 464–65, 87 S.Ct. at 1782–83. It has not been cited by the California Su-

ceeded to find that, based on its policy rationales and the conclusory statement in *Credit Managers* that the California legislature "clearly" did not mean § 3439.04 to apply to LBOs [19], "we believe this grant of standing to sue must be modified in light of an LBO in which there was no actual intent to defraud." *Id.* The Court did not cite to one California case enunciating a rule of statutory construction by which courts may, in furtherance of favored policy outcomes, "doubt" plain statutory language and then "modify" it [20].

Unsurprisingly, the Ninth Circuit rules have been widely rejected elsewhere. Other courts have found fraudulent conveyance laws applicable to LBOs [21], and allowed post-LBO creditors to use such provisions [22]. These courts have frequently alluded to the extraordinary judicial activism entailed in rewriting fraudulent conveyance laws on policy grounds [23]. Indeed, one court in the Ninth

Circuit expressly noted the "tension between the Kupetz II decision and California statutory law . . . ." *In re Pajaro Dunes,* 174 B.R. at 575 n. 51. This near-universal rejection of the Ninth Circuit rules renders the California Supreme Court's acceptance of those rules all the more unlikely.

Finally, it is noteworthy that disagreement exists with respect to the policy rationales on which the Ninth Circuit based its rewriting of § 3439. *See, e.g., Tabor Court,* 803 F.2d at 1297 n. 2; *Leonard v. Norman Vinitsky Residuary Trust (In re Jolly's, Inc.),* 188 B.R. 832, 844 n. 17 (Bankr.D.Minn.1995); *Ferrari v. Barclays Business Credit, Inc. (In re Morse Tool),* 108 B.R. 389, 390–91 (Bankr. D.Mass.1989); *Ohio Corrugating Co. v. DPAC, Inc. (In re Ohio Corrugating Co.),* 91 B.R. 430, 434 n. 3 (Bankr.N.D.Ohio 1988). *See generally* Jenny B. Wahl & Edward T.

preme Court, and it concerned the differently-worded UFCA. In addition, the court in that case did not have to decide whether a subsequent creditor could state a cause of action, because "[i]t [was] clear from the record . . . that plaintiffs were creditors on the crucial date." *Pope,* 46 Cal.Rptr. at 237.

**19.** The court in *Credit Managers* cited nothing in support of its conclusion that the California legislature "clearly" did not intend fraudulent conveyance laws to apply to LBOs. *See* Jenny B. Wahl & Edward T. Wahl, *Fraudulent Conveyance Law and Leveraged Buyouts: Remedy or Insurance Policy?* 16 Wm. Mitchell L.Rev. 343, 367 (1990).

**20.** *See* David R. Weinstein, *supra* at 189 ("The court clearly observed the language of former California Civil Code s. 3439.05 . . . . [but] simply declined to apply the law.")

**21.** *See Tabor Court,* 803 F.2d at 1297 (applying the UFCA); *MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Services Co.,* 910 F.Supp. 913, 934–36 (S.D.N.Y.1995) ("Policy issues aside, there is nothing in the language of fraudulent conveyance statutes that renders them inapplicable to LBOs."); *Leonard v. Norman Vinitsky Residuary Trust (In re Jolly's, Inc.),* 188 B.R. 832, 844 n. 17 (Bankr.D.Minn.1995) ("[R]egardless of its humble origins in the collection of simple debts, there is nothing in the basic nature of fraudulent-transfer law that should prevent its application to a situation where large creditor constituencies have lost the benefit of their rights to collection as a result of a debtor's transfer of value."); *Ohio Corrugating Co. v. DPAC, Inc. (In re Ohio Corrugating Co.),* 91 B.R. 430, 433–34 (Bankr.N.D.Ohio 1988) ("If the rights of credi-

tors have been impaired, we see no reason to except LBOs from the operation of fraudulent conveyance law if the transfers otherwise fit within the statutory framework".)

**22.** *See. Weinman v. Fidelity Capital Appreciation Fund (In re Integra Realty Resources, Inc.),* 198 B.R. 352, 363 (Bankr.D.Colo.1996) ("[T]he Court will not follow the Kupetz exception regarding knowledge and instead will apply the plain language of the statute which allows the post-transfer creditors to be protected from the conveyance."); *Brandt v. Hicks, Muse & Co., Inc (In re Healthco Int'l, Inc.),* 195 B.R. 971, 980 (Bankr. D.Mass.1996) ("[F]uture creditors have avoidance rights if a transaction without adequate consideration leaves the debtor with unreasonably small capital."); *Ferrari v. Barclays Business Credit, Inc. (In re Morse Tool, Inc.),* 108 B.R. 389, 390 (Bankr.D.Mass.1989) (constructive fraudulent transfer provisions of UFCA "expressly extend their benefits to future creditors.").

**23.** *See MFS/Sun,* 910 F.Supp. at 934 ("[I]t is for the legislatures rather than the courts to determine whether to exempt leveraged buyout transactions from the fraudulent conveyance laws."); *In re Morse Tool,* 108 B.R. at 390 ("I need not decide which side has the better argument. The point is that the application of the future creditor provisions . . . to leveraged buy-outs is not so absurd or unreasonable that it could not fairly be attributed to legislative design."); *In re Ohio Corrugating Co.,* 91 B.R. at 434–34 ("[T]he suggestion . . . that LBOs ought to be exempted from fraudulent conveyance law . . . is largely a policy matter which is most appropriately left to the consideration of Congress and state legislatures.").

Wahl, *Fraudulent Conveyance Law and Leveraged Buyouts; Remedy or Insurance Policy?* 16 Wm. Mitchell L. Rev. 343, 367 (1990). Beyond greatly weakening *Kupetz* and its progeny, this raises doubt as to whether the California Supreme Court would agree with the Ninth Circuit on policy grounds to begin with. It is thus extremely difficult to envision the California Supreme Court abandoning the plain language of § 3439 in favor of such a precarious alternative.

Since the Ninth Circuit decisions on this subject are federal judicial legislation at its worst, this Court concludes that the California Supreme Court would not follow them but rather would adhere to its own statutory construction principles, and leave the "modification" of § 3439 to the California legislature.

### c. Rhode Island law

■ The foregoing analysis applies to the law of Rhode Island as well. Rhode Island's principles of statutory construction are similar to those of California, and render it highly unlikely that the Rhode Island Supreme Court would ignore the plain language of R.I. Gen. Laws §§ 6–16–1 to 12 and follow the Ninth Circuit rule for policy reasons[24]. *See, e.g., LaPlante v. Honda North America, Inc.,* 697 A.2d 625, 629 (R.I.1997) ("[W]e generally presume that the legislature intended every word of a statute to have a useful purpose and to have some force and effect. . . .") (internal quotation omitted); *State v. LaRoche,* 683 A.2d 989, 997 (R.I.1996) ("It is well-settled law that the words of a statute are accorded their literal and plain meaning un-

less those words are ambiguous."); *O'Neil v.Code Comm'n for Occupational Safety & Health,* 534 A.2d 606, 608 (R.I.1987) ("This court has said on numerous occasions that when the language of the statute is unambiguous and expresses a clear and sensible meaning, no room for statutory construction or extension exists and we are required to give the words of the statute their plain and obvious meaning.").

Moreover, the existing body of Rhode Island law on fraudulent conveyances indicates neither a hostility to the constructive fraudulent transfer provisions of the UFTA, nor a predilection toward exempting broad classes of transfers from the statute's reach.

In sum, for the reasons extensively detailed in the foregoing analysis of California law, the Court concludes that the Rhode Island Supreme Court would apply §§ 6–16–1 to 12 as written, and would not adopt the Ninth Circuit rule exempting "above-board" LBOs from the constructive fraudulent transfer provisions, and deny standing to post-LBO creditors in "well-publicized" LBOs.

As a result, there is no conflict of substantive law in this case. For purposes of the present motion, then, the Court rejects defendants' argument that the constructive fraudulent transfer provisions of the UFTA do not apply to this LBO, and therefore that the Complaint must be dismissed for failure to plead actual fraud. Also rejected is defendants' argument that a post-LBO creditor may not invoke the constructive fraudulent transfer provisions of UFTA § 4[25].

---

**24.** Indeed, as noted *supra,* it cannot even be assumed that the Rhode Island Supreme Court would agree with the Ninth Circuit on policy grounds. *See, e.g., Tabor Court,* 803 F.2d at 1297 n. 2; *In re Jolly's,* 188 B.R. at 844 n. 17; *In re Morse Tool,* 108 B.R. at 390–91; *In re Ohio Corrugating,* 91 B.R. at 434 n. 3. *See generally* Wahl & Wahl, *supra,* at 367.

**25.** Defendants' argument in this respect appears to be tied to the argument, discussed *infra,* that the Complaint fails to adequately plead the existence of an existing creditor on the date of the LBO. The objective seems to be to first eliminate the standing of the trustee to assert claims on behalf of post-LBO creditors under Counts I and III, and then invalidate the pleading entirely as to pre-LBO creditors.

Defendants also attempt to engraft their desired requirement of a pre-LBO creditor for the purposes of Counts I and III onto 11 U.S.C. § 544(b), arguing that this section confers standing upon the trustee only if there is an unsecured creditor with a claim existing on both the date of the transfer and the date of the bankruptcy filing. Defendants contend that this requirement exists as a matter of federal bankruptcy law, apart from the UFTA.

This argument is without merit. § 544(b) states, "The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . ." The trustee's standing is thus derivative of that of a creditor under "applicable law", here the UFTA. *See generally* 4 *Collier*

## 2. Pleading Issues

Defendants contend that the Complaint consists merely of conclusory allegations tracking the language of the UFTA, and thus must be dismissed for failure to satisfy Fed. R.Civ.P. 9(b).

■ Rule 9(b) states, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Rule 9(b) applies to this case, but does not exist in a vacuum. Rather, it must be read "in harmony with Fed. R.Civ.P. 8, which requires only a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 497 (N.D.Ill.1988) ("*Wieboldt I* "); *see also Harrison v. Entertainment Equities, Inc. (In re Rave Communications, Inc.)*, 138 B.R. 390, 394 (Bankr.S.D.N.Y.1992).

Defendants argue first that the Complaint fails to adequately plead the element of an existing creditor prior to the LBO who remains unpaid[26]. ¶ 31 of the Complaint states:

> On August 6, 1993, Almac's commenced the Bankruptcy Cases. Almac's has creditors with claims arising both before and after the 1991 LBO which were unpaid on August 6, 1993 and remain unpaid.

This allegation is then incorporated by reference into Counts I through IV.

Defendants argue that this pleading is "insufficient as a matter of law", because the burden of proof is on the party whose standing is questioned. Furthermore, they point to the Debtors' schedules of unsecured creditors and contend that many of them are

trade creditors whose current claims are not the same as the claims held prior to the LBO.

Plaintiff responds that no creditors need actually be named; rather, ¶ 31 sets forth allegations of fact which may be objectively proven or disproven, and which must be taken as true for present purposes. Nevertheless, he continues, that he has named creditors anyway, and trade creditors with revolving accounts may be considered "existing creditors" for the purposes of UFTA § 5 even if the claims they held at the time of the bankruptcy filing are not the claims they held at the time of the LBO.

■ The Court will not try this case on a motion to dismiss. A probing inquiry into who the creditors are, and what claims they hold, is inappropriate at this stage of the case. What matters now is the sufficiency of what is *alleged*, not what is *proven*.

■ The Complaint clearly satisfies the requirements of Rules 8 and 9(b). *See, e.g., Coleman v. Alcock*, 272 F.2d 618, 622 (5th Cir.1959); *Wieboldt I*, 94 B.R. at 497–498; *In re Healthco*, 195 B.R. at 980; *In re Rave Communications*, 138 B.R. at 394. Plaintiff has alleged, in great detail, the underlying facts, the transfers alleged to be fraudulent, the reasons those transfers are allegedly fraudulent, and the roles of defendants in the transfers. *See Wieboldt I*, 94 B.R. at 498 (finding complaint sufficient where it alleged supporting facts, events surrounding tender offer and LBO, each defendant's participation in LBO, effect of LBO on debtor, assets involved in transactions, and factual and legal basis for claims against each defendant); *see also Unsecured Creditors' Comm.*

---

on Bankruptcy ¶ 544.03. The relevant inquiry for purposes of § 544(b) is whether an unsecured creditor could bring a claim under the UFTA; if so, then the Trustee may bring the claim.

For the purposes of Counts I and III, the Trustee need not allege and prove that all the creditors he represents had claims existing on the date of the LBO, since the Court concludes that UFTA § 4 allows claims by a post-LBO creditor. While defendants cite cases that purportedly would impose such a requirement, these cases are inapposite because they involve underlying state laws that bar post-transfer claims. *See, e.g., SPC Plastics Corp. v. Griffith (In re Structurlite Plastics Corp.)*, 193 B.R. 451, 458–59 (Bankr.

S.D.Ohio 1995); *Karnes v. McDowell (In re McDowell)*, 87 B.R. 554, 557–58 (Bankr.S.D.Ill. 1988).

However, for the purposes of Counts II and IV, which are based on UFTA § 5 and require a pre-LBO creditor, § 544(b) likewise imposes such a requirement.

**26.** Of course, in light of the foregoing analysis of the UFTA and 11 U.S.C. § 544(b), this is not required for Counts I and III. It is, however, required for Counts II and IV, which are based on UFTA § 5, R.I. Gen. Laws § 6–16–5, Cal. Civ.Code § 3439.05.

v. *Banque Paribas (In re Heartland Chemicals, Inc.)*, 103 B.R. 1012, 1015 (Bankr. C.D.Ill.1989)("The factual allegations in the complaint show how, when and where the fraud occurred. Nothing more is required by Rule 9."). This pleading places defendants on notice of the allegations against them, allows preparation for a defense and allays any concerns about reckless allegations of fraud. *Id.*

Plaintiff's failure to name an existing creditor is of no moment, for he is not required to prove his case at this point; his allegation that such a creditor exists suffices. *Coleman*, 272 F.2d at 622; *In re Healthco*, 195 B.R. at 980. As the Court stated in *In re Healthco*:

> [T]he Trustee alleges he represents 'at least one qualified, unsecured creditor holding an allowable unsecured claim which existed at the time of the LBO....' Under the liberal rule of notice pleading, that allegation is enough. The Trustee need not name the creditor. Nor is it necessary that the claim held by that creditor at the bankruptcy filing be identical to the one he held at the time of the LBO.

195 B.R. at 980.

Next, defendants argue that the Complaint is defective in pleading the elements of the debtor's insolvency, inadequate capitalization, or inability to meet debts under the UFTA. Counts I through IV plead these issues generally; for example, ¶ 33 states, "Almac's made such payments without receiving a reasonably equivalent value in exchange therefor and was engaged in or was about to engage in business or transactions for which Almac's remaining assets were unreasonably small in relation to such business or transactions."

Defendants argue that Rules 8 and 9(b) require greater particularity, and list specific types of facts that plaintiff should have pleaded[27]. Defendants then assert that the burden is on plaintiff to prove these elements, and proceed at length to explain why, in fact, Almac's was not insolvent, inadequately capitalized, or unable to meet debts as they came due at the time of, or as a result of, the LBO.

Plaintiff's response is that the pleading sets forth objectively verifiable allegations of fact, which must be taken as true for purposes of a motion to dismiss.

As stated before, this Court will not try this case on the pleadings. Defendants' extensive discussion of the substantive merits of plaintiff's claim is presently irrelevant.

What matters now is the sufficiency of this Complaint, and, for the reasons discussed *supra*, it is adequate. *See, e.g., Coleman*, 272 F.2d at 622; *Wieboldt I*, 94 B.R. at 497–498; *In re Healthco*, 195 B.R. at 980; *In re Rave Communications*, 138 B.R. at 394. Plaintiff's burden of proof does not require him to prove his case in the Complaint. Rather, he need only set forth allegations of fact sufficient to place defendants on notice of the claims against them, allow them to prepare a defense, and allay any concerns about reckless allegations of fraud. *Id.* The detailed allegations concerning the transfers at issue easily meet this burden. The Complaint need not recite the details of Almac's financial condition; that is a matter for discovery and later proof[28].

---

27. Defendants submit that plaintiff should have alleged facts concerning the identity and fair market value of the Debtors' assets before and after the Stock Purchase; the nature and extent of the Debtors' capital and the extent to which he believed they were undercapitalized; the amount of working capital or income which was allegedly necessary to maintain the Debtors as a going concern; the identity and amount of the Debtors' liabilities; the source, if any, of any working capital for the Debtors; and the actual cash flow of the Debtors and their gross and net profit margins.

28. The cases cited by defendants are inapposite. They stress the undisputed proposition that Rule 9(b) requires particularity in pleading as to the acts alleged to be fraudulent, so as to place a defendant on notice of the charges, and prevent fishing expeditions by plaintiffs seeking to discover, rather than prove, their cases. *See Gindi v. Silvershein*, 1996 WL 194304 (S.D.N.Y.1996); *Miner v. Bay Bank & Trust Co. (In re Miner)*, 185 B.R. 362 (N.D.Fla.1995) *aff'd Miner v. Bay Bank Trust Co.*, 83 F.3d 436 (11th Cir.1996); *Hassett v. Zimmerman (In re O.P.M. Leasing Services, Inc.)*, 32 B.R. 199 (Bankr.S.D.N.Y.1983). They do not stand for, or support, the proposition that a plaintiff must state the particulars of insolvency, inadequate capitalization, or inability to meet debts.

■ Finally, the same can be said with regard to the Complaint's allegation that the Citicorp Defendants did not provide fair value to Almac's. From the Complaint, plaintiff's position is clearly that Almac's did not benefit from the LBO, and thus the services provided by the Citicorp Defendants in connection with the LBO were not of "reasonably equivalent value" to the fees paid for those services. Whether or not this is true is a question for another day. For present purposes, the allegations themselves are sufficient.

The whole Complaint is adequate, and no portion of the Complaint will be dismissed on Rule 8 or 9(b) grounds.

### 3. 11 U.S.C. § 546(e): Settlement Payments

11 U.S.C. § 546(e) exempts certain categories of transfers from the reach of the trustee's broad avoidance powers. In relevant part, § 546(e) provides that:

> [T]he trustee may not avoid a transfer that is a . . . settlement payment, as defined in section 101 or 741 of this title, made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, that is made before the commencement of the case . . . .

§ 741(8) [29], in turn, defines "settlement payment" as follows:

> [A] preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade . . . .

Defendants argue that this exception applies to exempt the transfers in connection with the LBO from plaintiff's avoidance powers, because "[i]n settlement of the sale of their stock, the Selling Defendants tendered their shares to The Yucaipa Companies, which, as the Paying Agent and Escrow Agent for the Selling Defendants, functioned as a broker or clearing agency in the context of the transaction."

Plaintiff counters that the "settlement payment" exception is an "exceptionally narrow safe harbor", inapplicable here because the transfers were not settlement payments made by a stockbroker.

■ The § 546(e) exception applies if the transfers were: (1) "settlement payments"; and (2) made "by or to" one of the enumerated entities. *Munford v. Valuation Research Corp. (Matter of Munford, Inc.)*, 98 F.3d 604, 610 (11th Cir.1996) *cert. denied sub nom. DFA Inv. Dimensions Group Inc. v. Munford, Inc.,* — U.S. —, 118 S.Ct. 738, 139 L.Ed.2d 675 (1998) and *cert. denied sub nom. Munford v. Munford, Inc.,* — U.S. —, 118 S.Ct. 739, 139 L.Ed.2d 675 (1998); *Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.),* 952 F.2d 1230, 1236–37 (10th Cir.1991); *Wider v. Wootton,* 907 F.2d 570, 572 (5th Cir.1990).

In determining whether the transfers at issue were "settlement payments" within § 546(e), the Court looks first to the definition provided in § 741(8). This definition defies plain meaning; to the contrary, courts have recognized that it is circular and cryptic. *In re Healthco,* 195 B.R. at 983; *Wieboldt Stores, Inc. v. Schottenstein,* 131 B.R. 655, 663 (N.D.Ill.1991) (*"Wieboldt II"*). Essentially, it provides that a settlement payment is a settlement payment, and points the curious to the common use of the term in the securities trade. Thus, a general understanding of the securities industry is necessary in order to apply § 546(e) as Congress intended.

The securities industry utilizes a "clearance and settlement" system, wherein parties use intermediaries to make trades of public stock which are instantaneously credited, but in which the actual exchange of stock and consideration therefor takes place at a later date. *See Wieboldt II,* 131 B.R. at 664–65 (citing Neil M. Garfinkel, Note, *No Way Out: Section 546(e) Is No Escape for the Public Shareholder of a Failed LBO,* 1991 Colum.

---

**29.** The definition of "settlement payment" in 11 U.S.C. § 101(51A) applies to the forward contract trade.

Bus. L.Rev. 51 (internal citations omitted)("Note")). This later date is known as the "settlement" date; on this date the trade is "settled" by actually exchanging what was promised on the trade date. *Id.*

The intermediaries' role in this system is critical; typically there are several layers of brokers on each side of a trade, with a clearing agency positioned in the middle. *Id.* The clearing agency, on the date of the trade itself, makes entries (credits or debits) in the accounts of its members (financial institutions or brokers), which reflect the trade. *Id.* Thus, while settlement occurs later, the trade itself is functionally instantaneous. The system depends upon a series of guarantees, made by all parties in the chain, that they will live up to their obligations regardless of a default by another party in the chain. *Id.* These guarantees allow the parties to trade free of worry about events between the trade date and the settlement date.

■ The need to preserve the stability of this system led Congress to create the § 546(e) exception to the trustee's avoidance powers. *See Jewel Recovery, L.P. v. Gordon,* 196 B.R. 348, 352 (N.D.Tex.1996); *Wieboldt II,* 131 B.R. at 664. If the pre-bankruptcy trades by a bankrupt intermediary could be set aside, then the guarantees that allow the system to function would be threatened, the parties could not proceed with confidence, and a bankruptcy by one party in the chain could spread to other parties in the chain, threatening a collapse of the entire industry. *Id.*

Against this background, it appears unlikely that Congress intended the term "settlement payment" to cover the present transfers. True, these transfers "settled" a purchase and sale of securities. The Tenth Circuit has held that payments made by brokers to selling shareholders in an LBO are

"settlement payments" covered by the § 546(e) exception. *Kaiser Steel,* 952 F.2d at 1240. Another court, however, has held that such payments were not meant to be covered by § 546(e). *Wieboldt II,* 131 B.R. at 664–65. In addition, commentators have criticized *Kaiser* for applying § 546(e) in a situation that did not implicate the concerns behind that exception. *See, e.g.,* Frank R. Kennedy & Gerald K. Smith, *Fraudulent Transfers and Obligations: Issues of Current Interest,* 43 S.C. L.Rev. 709 (1992); William C. Rand, Comment, *In re Kaiser Steel Corporation; Does Section 546(e) of the Code Apply to a Fraudulent Conveyance Made in the Form of an LBO Payment?,* 19 Fordham Urb. L.J. 87 (1991); Jane Elizabeth Kiker, Casenote, *Judicial Repeal of Fraudulent Conveyance Laws: Kaiser Steel Corp. v. Charles Schwab & Co.,* 913 F.2d 846 (10th Cir.1990), 14 Hamline L.Rev. 453 (1991).

In both *Kaiser* and *Wieboldt II,* the LBOs involved the clearance and settlement system; while the respective courts split on whether the LBOs were sufficiently connected to the system to justify the application of § 546(e), the system was at least involved. *Kaiser Steel,* 952 F.2d at 1235–36; *Wieboldt II,* 131 B.R. at 664–65.

■ Here, however, the question is not nearly as close, because the system of intermediaries and guarantees was not even used. The only purported intermediary in the case, The Yucaipa Companies, was an entity inextricably linked to the rest of the Yucaipa Defendants[30]. The only possible link between this transaction and the securities industry is the fact that securities were sold; however, the stock at issue was not even publicly traded. The stock transfers thus had no connection whatsoever to the clearance and settlement system, and allowing avoidance would have no impact at all on that system.[31]

---

**30.** "These business entities and individuals are interrelated. For example, Ronald W. Burkle, Mark Resnik [now deceased] and Richard d'Abo are partners of The Yucaipa Companies; the general partners of The Yucaipa Capital Fund are Yucaipa Capital Advisors, Inc. and The Yucaipa Companies; and Joe S. Burkle is the general partner of Almac's Partners, L.P." *In re Almac's,* 202 B.R. at 650 n. 1.

**31.** This may also be inferred in part from defendants' failure to argue that the Yucaipa Companies, as the "Paying Agent and Escrow Agent for the Selling Defendants", was not an "initial transferee" under 11 U.S.C. § 550 and thus immune from the trustee's attack. As several courts have noted, true conduits who do not take beneficial ownership in securities in LBOs may

It thus appears highly unlikely that Congress would intend these transfers to be covered as "settlement payments". *See Jewel Recovery*, 196 B.R. at 352–53 (finding that while private transaction may fit definition of "settlement payments", it would not implicate clearance and settlement process, and thus application of § 546(e) would be inconsistent with statutory scheme); *In re Healthco*, 195 B.R. at 983 (finding that one-time distribution in complete liquidation of stock interest was "not what Congress had in mind in enacting section 546(e)", where there was no showing of a guaranty by a securities clearing agency).

Even if the transfers were "settlement payments", however, § 546(e) does not apply because they were not made "by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency". Simply put, The Yucaipa Companies was none of the above. While defendants contend that The Yucaipa Companies "functioned as a broker or clearing agency in the context of the transaction", they have made no showing whatsoever that it was in fact either[32]. Rather, as noted *supra*, The Yucaipa Companies was an entity

inextricably linked to the rest of the Yucaipa Defendants, itself owning and selling stock in the LBO. Merely placing The Yucaipa Companies in the middle of this transaction and designating it Paying Agent and Escrow Agent does not make it a § 546(e) entity, and defendants will not escape avoidance on this basis. The words of the Court in *Jewel Recovery* are particularly apt:

> The affirmative application of § 546(e) to this transaction would serve to sanction the practice of structuring private stock purchases in an effort to circumvent the avoidance section, merely by utilizing a financial institution. Private transactions lack the impact on the public market trading systems that Congress intended to protect by § 546(e).

196 B.R. at 353.

The § 546(e) exception does not apply here, and the Court rejects defendants' motion to dismiss on those grounds.

### 4. 11 U.S.C. § 550(d): Single Satisfaction

The next pellet in defendants' shotgun blast of arguments is that the "single satis-

---

32. 11 U.S.C. § 101(53A) defines "stockbroker" as follows:

> "stockbroker" means person—
> (A) with respect to which there is a customer, as defined in section 741 of this title; and
> (B) that is engaged in the business of effecting transactions in securities—
> (i) for the account of others; or
> (ii) with members of the general public, from or for such person's own account . . . .

11 U.S.C. § 741(2), in turn, reads:

> "customer" includes—

not be subject to an avoidance recovery at all, thus rendering a § 546(e) exception unnecessary. *See Munford*, 98 F.3d at 610; *In re Healthco*, 195 B.R. at 981–982.

Such an argument has not been made here; indeed, defendants, while arguing that the Yucaipa Companies "functioned as" a broker or clearing agency "in the context of the transaction", elsewhere in their brief admit that the Yucaipa Companies owned and sold Almac's stock in the LBO. *Memorandum in Support of Yucaipa Defendants' Motion to Dismiss Complaint or to Transfer Venue to Central District of California*, at 2 n. 2. Clearly, then, these transfers did not entail the chain of intermediaries and guarantees which characterize the clearance and settlement system.

> (A) entity with whom a person deals as principal or agent and that has a claim against such person on account of a security received, acquired, or held by such person in the ordinary course of such person's business as a stockbroker, from or for the securities account or accounts of such entity-
> (i) for safekeeping;
> (ii) with a view to sale;
> (iii) to cover a consummated sale;
> (iv) pursuant to a purchase;
> (v) as collateral under a security agreement; or
> (vi) for the purpose of effecting registration of transfer; and
> (B) entity that has a claim against a person arising out of—
> (i) a sale or conversion of a security received, acquired, or held as specified in subparagraph (A) of this paragraph; or
> (ii) a deposit of cash, a security, or other property with such person for the purpose of repurchasing or selling a security . . . .

Finally, 11 U.S.C. § 101(48) defines "securities clearing agency" as a "person that is registered as a clearing agency under section 17A of the Securities Exchange Act of 1934 or whose business is confined to the performance of functions of a clearing agency with respect to exempted securities, as defined in section 3(a)(12) of such Act for the purposes of such section 17A . . . ."

faction" rule of 11 U.S.C. § 550(d) precludes plaintiff's claims [33]. Section 550(d) prevents the trustee from achieving the same recovery several times from multiple transferees in a particular transaction.

Defendants' argument turns on the resolution, by the Plan, of certain secured claims. In relevant part, the Plan resolved: (1) the secured claims of the Citicorp Defendants, arising from the security interests granted by Almac's in exchange for the cash used to fund the LBO; and (2) the secured claims of the holders of securities issued by Almac's to raise cash to fund the LBO. These two groups of claimants were, under the Plan, to receive pro rata shares of senior subordinated notes issued by New Almacs, as well as unsecured deficiency claims, and would be released from potential avoidance actions by the trustee on the basis of their secured claims. Defendants appear to argue that because the Plan resolved these claims, the trustee is now precluded from bringing the present avoidance action as well.

■■■ The Court need not tarry long on this issue; defendants utterly fail to explain how avoidance of the cash transfers to both sets of defendants would constitute a double recovery. The present claims are entirely distinct from those resolved by the Plan; the Plan settled potential actions to avoid the security interests held by the lenders and security holders, while the present action is for avoidance of cash transfers [34]. Again, these two sets of claims are entirely distinct, and the specter of a double recovery is simply not present. § 550(d) does not bar these claims.

Accordingly, for the reasons stated *supra*, defendants' motions to dismiss are denied in their entirety. The case will proceed to the next phase—answer by defendants to the Complaint and discovery.

## IV. Motion to Transfer

■■■ The question remains as to *where* the case will proceed; defendants seek a transfer to the Central District of California. 28 U.S.C. § 1404(a) states, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." [35] " 'Section 1404(a) is intended to place discretion in the District Court to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness.' " *Blinzler v. Marriott Int'l, Inc.*, 857 F.Supp. 1, 3 (D.R.I.1994)(quoting *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 2244, 101 L.Ed.2d 22 (1988)(internal quotation and citation omitted)).

■■■ The party seeking to transfer venue under § 1404(a) bears a heavy burden. *Blinzler*, 857 F.Supp. at 3; *Paradis v. Dooley*, 774 F.Supp. 79, 82 (D.R.I.1991); *Ryan, Klimek, Ryan Partnership v. Royal Ins. Co. of America*, 695 F.Supp. 644, 646 (D.R.I. 1988). This section governs cases in which the convenience, not the propriety, of venue is challenged [36]; the challenger must therefore establish that the balance of convenience weighs in its favor. *Id.* The plaintiff's choice of forum is entitled to great weight, and the challenger carries a heavy burden of showing a strong balance of inconvenience. *Blinzler*, 857 F.Supp. at 3 (internal quotation omitted). Moreover, transfer is inappropriate if it merely shifts inconvenience from one party to the other. *Id.* " 'Section 1404(a) provides for transfer to a more convenient forum, not to a forum likely to prove equally convenient or inconvenient.' " *Id.* (quoting

---

**33.** 11 U.S.C. § 550(d) provides that "[t]he trustee is entitled to only a single satisfaction . . ." of an avoidance claim.

**34.** Moreover, the Plan expressly distinguished the two sets of claims, not only providing for the present action, but doing so as the primary means for recovery by the unsecured creditors.

**35.** 28 U.S.C. § 1412 states: "A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties." The analysis is the same as under § 1404(a). *In re Spillane*, 884 F.2d 642, 645 n. 4 (1st Cir.1989).

**36.** Because defendants did not object to venue in their motions to dismiss, such objection is waived under Fed.R.Civ.P. 12(h)(1). It is therefore only the *convenience* of venue that is open to challenge.

*Van Dusen v. Barrack,* 376 U.S. 612, 645–46, 84 S.Ct. 805, 824, 11 L.Ed.2d 945 (1964)).

Defendants argue that the Court should not place great weight upon plaintiff's choice of forum, because plaintiff is not a resident of the forum. This Court has recognized that the strong presumption in favor of a plaintiff's choice of forum "is greatly weakened where plaintiff's chosen forum is not also his home." *Ryan, Klimek, Ryan Partnership,* 695 F.Supp. at 647 (citing *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255–56, 102 S.Ct. 252, 265–66, 70 L.Ed.2d 419 (1981)). It is undisputed that plaintiff is not a resident of Rhode Island. However, the Court will not ignore the reality of the situation: plaintiff sues on behalf of a trust for the benefit of creditors, many of whom are Rhode Island residents. *Cf. id.* (home of any partner is home of partnership for venue purposes). Thus, plaintiff's choice of forum will not be entirely discounted.

In any event, "[t]his circuit ... has not established the rule, as some other circuits have, that when plaintiffs sue in a forum that is not their residence, their choice of venue is entitled to only minimal consideration." *Ashmore v. Northeast Petroleum Div. of Cargill, Inc.,* 925 F.Supp. 36, 39 (D.Me.1996). A heavy burden, therefore, remains on defendants to establish that convenience outweighs plaintiff's choice, and justifies transfer.

This Court's opinion in *Ryan, Klimek, Ryan Partnership* sets forth the appropriate factors regarding transfer, as outlined by the Supreme Court:

> The factors pertaining to the private interests of the litigants include [] the 'relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.' The public factors bearing on the question include [] the administrative difficulties flowing from court congestion; the 'local interest in having localized controversies

decided at home'; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

695 F.Supp. at 647 (quoting *Piper Aircraft,* 454 U.S. at 241 n. 6, 102 S.Ct. at 258 n. 6 (internal citations omitted)).

■■■ The private factors do not clearly call for transfer. Defendants claim that this case is simply about the 1991 LBO, and thus should be transferred to California because, *inter alia,* that is where the transactions occurred, and is where the Yucaipa Defendants many witnesses and records concerning the transactions are located.[37]

This is too narrow a view of the case. Plaintiff does not dispute the essential facts of the LBO itself, but rather argues that it caused the demise of Almac's; thus, the dispute is really over conditions and events occurring primarily in Rhode Island, rather than California. While Almac's was a Delaware corporation, its primary place of business was Rhode Island; plaintiff asserts that most of the creditors are located here, and the bankruptcy itself proceeded here. Plaintiff submits that the Purchaser maintains possession in New York of Almac's records, and offers the names (presumably as potential witnesses) of several former Almac's management-level employees who reside in Rhode Island.

Thus, it is not clear that transferring this case to California would serve a purpose other than to merely shift the inconvenience from defendants to plaintiff. Geography dictates inconvenience to someone; defendants have not established that moving the case to California would merely shift that inconvenience to plaintiff.

Moreover, defendants have not shown that the public factors warrant transfer. This Court has already devoted tremendous resources to becoming familiar with the factual background and the legal issues involved in this case, and transfer would waste scarce

---

**37.** The Citicorp Defendants are not California residents, but do business there.

judicial resources here and in California. Moreover, as far as docket congestion is concerned, this Court's dockets are among the most current and efficient in the country. There is also a strong "local interest in having localized controversies decided at home." *Ryan, Klimek, Ryan Partnership*, 695 F.Supp. at 647 (quoting *Piper Aircraft*, 454 U.S. at 241 n. 6, 102 S.Ct. at 258 n. 6 (internal citations omitted)). As noted *supra*, this case concerns events and conditions in Rhode Island, as they affected a Rhode Island-based business and its relationships to Rhode Island creditors. Rhode Island's strong interest in the disposition of Almac's estate, and in the payment of debts to resident creditors, outweighs any interests California has in this case. Finally, while choice of law is a factor in the transfer analysis, this Court has ruled that there is no conflict between the California and Rhode Island versions of the UFTA, as applied to this case. Thus, there is no clear advantage to transferring this case to California.

The Court recognizes the inconvenience to defendants (particularly the Yucaipa Defendants) of litigating in Rhode Island. However, they cannot carry the heavy burden of showing that the balance of convenience strongly favors them. Accordingly, the Motion to Transfer Venue to Central District of California hereby is denied.

## V. Conclusion

For the reasons stated above, the motions of the Yucaipa Defendants and the Citicorp Defendants to dismiss hereby are DENIED. In addition, the motion of the Yucaipa Defendants to transfer venue hereby is DENIED. The Order staying discovery, previously entered by the Court, hereby is vacated.

It is so ordered.